UNITED STATES of America, Plaintiff,

v.

MARYLAND AND VIRGINIA MILK PRODUCERS ASSOCIATION, Inc., Defendant.

Civ. A. No. 4482–56.

United States District Court
D. Columbia.

Nov. 21, 1958.

Joseph J. Saunders, Edna Lingreen, Joseph E. Waters, and A. Duncan Whitaker, Dept. of Justice, Washington, D. C., for plaintiff.

Herbert A. Bergson, William J. Hughes, Jr., Daniel H. Margolis, Daniel J. Freed, and Nicholas J. Chase, Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is a civil action brought by the United States against the Maryland and Virginia Milk Producers Association, Incorporated, under the antitrust laws, for injunctive and similar relief. While the complaint, which relates to the milk industry in the Washington Metropolitan area, is not technically divided into separate counts, it in effect sets forth three separate claims for relief or causes of action. The first cause of action charges an attempt to monopolize interstate trade and commerce in supplying milk for resale as fluid milk in the Washington Metropolitan area, comprising the District of Columbia and nearby regions of Maryland and Virginia. This cause of

action is based on Section 2 of the Sherman Act, 15 U.S.C.A. § 2. The second cause of action charges a combination and conspiracy to eliminate and foreclose the competition above-mentioned by making and carrying out a contract for the transfer to the defendant of substantially all of the assets of a concern known as Embassy Dairy, Incorporated, which is a retail outlet for milk in the area. This cause of action is predicated on Sections 1 and 3 of the Sherman Act, 15 U.S.C.A. §§ 1, 3. The third cause of action which has been the subject matter of the present section of the trial, charges that the defendant on July 26, 1954, acquired substantially all of the assets of Embassy Dairy, Incorporated, and that the effects of this acquisition have been or may be substantially to lessen competition or to tend to create a monopoly in the production and sale of milk to dealers in the Washington Metropolitan area. This cause of action further charges that, with the same effect, the defendant on December 6, 1957, purchased and acquired all of the outstanding capital stock of Richfield Dairy Corporation and Simpson Brothers, Incorporated, which operated the Wakefield Dairy. This cause of action is founded on Section 7 of the Clayton Act, 15 U.S.C.A. § 18. The pertinent provision of that section is found in its first paragraph, and reads as follows:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The defendant is an agricultural co-operative association, having as members nearly two thousand milk producers, that is, persons operating dairy farms at which milk is produced. As an affirmative defense the defendant pleaded that it is immune and exempt from prosecution under the antitrust laws under Section 6 of the Clayton Act, 15 U.S.C.A. § 17, and Section 1 of the Capper-Volstead Act, 7 U.S.C.A. § 291. The Court directed a separate trial of this affirmative defense. The outcome of the separate trial was that the Court, D.C., 167 F. Supp. 45, reached the conclusion that the defense of immunity was valid as to the first cause of action, on the ground that activities of agricultural cooperative associations are expressly exempted by statute from prosecution under the antitrust laws, either in criminal or civil proceedings. The Court further held, however, that this immunity does not extend to contracts or combinations involving, in addition to agricultural co-operatives, any person or concern that is not an agricultural cooperative association and, therefore, not entitled to exemption. On this basis, the Court held that the defense of immunity did not apply to the second and the third causes of action. The Court further held that the Capper-Volstead Act did not exempt agricultural cooperative associations from the provisions of Section 7 of the Clayton Act, to which reference has been made.

After a short recess, the trial was then resumed as to the third cause of action, and has just been concluded. The Court might observe at this juncture that, as a result of the efforts of counsel and the commendable cooperation between them, the various discovery weapons provided by the Federal Rules of Civil Procedure, 28 U.S.C.A., have been used in this litigation to the utmost extent. Requests for admissions numbering 1624 were submitted by the plaintiff and 211 such requests were submitted by the defendant. The great majority of these requests resulted in admissions. Interrogatories were used to a considerable degree and stipulations were made as to authenticity of documents. In addition, numerous stipulations of facts were entered into, some at a series of pretrial

hearings and others outside of the court-room. The result of this enlightened course of procedure has been that the factual disputes have been reduced to a minimum and the amount of evidence introduced at the trial was greatly diminished in volume, thereby shortening the trial by a considerable extent.

The issues arising out of the third cause of action are now before the Court for decision. Section 7 of the Clayton Act, which has been heretofore quoted, as originally enacted was limited to acquisitions of capital stock. By an amendment enacted on December 29, 1950, the Act was extended so as to cover acquisitions of assets as well. In addition, the amendment generally broadened the phraseology of the statute. In 1950 it became sufficiently comprehensive and inclusive in its terms so as to bring under its ban both horizontal and vertical acquisitions, either of capital stock or of assets of other concerns. In this connection it might be said that by "horizontal" acquisition is meant the acquisition or control of one competitor by another; while the word "vertical" is applied to an acquisition or control by a concern in one echelon, of a concern in another echelon in the same line of trade or commerce, such as a transaction between a manufacturer and a jobber or between a wholesaler and a retailer or between a manufacturer or dealer and a customer.

The statute was construed recently by the Supreme Court in United States v. E. I. duPont de Nemours & Company, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057. The facts of that case were unique. In 1917 duPont and Company acquired a considerable block of stock of General Motors Corporation. Obviously, the two corporations were not competitors and were not engaged in the same line of business. DuPont and Company, however, was selling certain commodities, such as fabrics, that were used in the manufacture of automobiles. Among the customers for these products was General Motors Corporation. The latter purchased some of these products from duPont and some from other manufacturers and dealers. In 1949 the Government brought a civil suit attacking the stock acquisition on the ground that it violated Section 7 of the Clayton Act, in that it tended to lessen competition between duPont and other dealers in similar products, all of whom were selling or endeavoring to sell their goods to General Motors Corporation. The Court held that the transaction violated Section 7 of the Clayton Act.

In discussing the construction to be accorded to the statute, the Court held that it was immaterial whether actual restraints or monopolies in fact resulted from a merger or an absorption condemned by the Clayton Act or in fact whether there was actually a substantial lessening of competition. The Court went even further and held that it was immaterial whether a substantial lessening of competition was intended. The test formulated in the duPont case was whether there was a reasonable probability that a substantial lessening of competition or a monopoly might result from the acquisition by one corporation of the capital stock or the assets of another corporation. On this point the Court said, 353 U.S. at page 589, 77 S.Ct. at page 875:

> "The section is violated whether or not actual restraints or monopolies, or the substantial lessening of competition, have occurred or are intended."

In order to be within the ban of the statute, it is, of course, necessary that there be reasonable probability of a lessening of competition or the creation of a monopoly within an area of effective competition. The market affected must be substantial and it must appear that competition may be foreclosed in a substantial share of that market. The Court expressly held that the Act applies both to horizontal and to vertical acquisitions.

So, too, the Court also indicated that the fact that all concerned acted honorably and fairly, each in the honest con-

viction that his actions were in the best interests of his own company, and without any design to overreach anyone, does not defeat the right of the Government to relief. Finally, the Court held, for the purposes of the case before it, that the test was whether at the time of the institution of the suit, and not necessarily at the time of the acquisition of the capital stock or assets, there was reasonable probability that the transaction was likely to result in the condemned restraints.

It must be observed that the duPont case was decided by a vote of four to two, with three members of the Court abstaining from participation. A query, therefore, arises whether this decison should be regarded only as *res judicata* as between the parties to it or whether it sets forth binding principles as well on the basis of *stare decisis*. We do not have the views of any five members of the Court on the questions decided in the duPont case.

The biggest bone of contention in that case, however, was whether the legality of the acquisition challenged by the Government may be judged by the situation existing as of the time of the institution of the suit instead of as of the date of the transaction. In the duPont case suit was instituted over thirty years subsequently to the transaction assailed by the Government. In this respect the case, if it should become a binding precedent, introduces a far-reaching innovation and a novel doctrine into the law, since ordinarily the validity of a person's acts or transactions is determined as of the date when they are performed or consummated and when the cause of action arises rather than as of some later time fortuitously or arbitrarily selected by the institution of suit. Fortunately, this is a question that does not concern us in the instant case, since here the Government contends that the challenged transaction was illegal as of its date, as well as of a subsequent time, and the Court is called upon to determine the issues as of the date of the original transaction and, of course, in the light

of subsequent events. Moreover, unlike the suit in the duPont case, in this instance the action was brought within a reasonable time after the challenged transaction. The accused merger took place on July 26, 1954, and the original complaint in this case was filed on November 21, 1956.

Going on to the facts that must govern the disposition of this controversy, the case relates to the Washington Metropolitan area, as has been stated, which consists of the District of Columbia and nearby Maryland and Virginia. This area constitutes a separate market for the retail distribution of milk. The defendant, Maryland and Virginia Milk Producers Association, Incorporated, is a Maryland corporation, having its principal office in the District of Columbia. As has been stated, it is an agricultural cooperative association, having as members nearly two thousand dairy farmers, most of whom are located in Maryland and Virginia. The milk is delivered by the members to the defendant, which acts as the marketing agency for them. Most of the milk is sold eventually to dealers in the Washington Metropolitan area. The defendant also owns a plant at which it transforms surplus milk into various milk products, such as ice cream and powdered milk. The net worth of the defendant corporation is approximately five million dollars.

For the purpose of determining the price to be charged to customers and the price to be paid by the Association to its members, the milk is divided into three categories. So much as is resold to the ultimate consumers in liquid form is placed in Class I; so much as is converted into cream or cottage cheese forms Class II; and the balance, known as surplus milk, which is transformed into other by-products, such as ice cream and powdered milk, is denominated Class III. The commodity in Class I and Class II is known in the trade as fluid milk. Different prices are charged to the customer for milk in each of the three groups, Class I receiving the highest and Class III receiving the lowest price.

Since all milk delivered to the Association by its members forms a single pool, figuratively speaking, out of which all sales are made, it is impossible to allocate specific quantities to each of the three classes out of each member's contribution. Accordingly, a so-called "blend" price is ascertained on the basis of the proportions of total sales made by the Association in each class out of the aggregate amount sold during a specified period. The Association then pays its members on the basis of the "blend" price, after deducting a percentage, of course, for its maintenance and operating expenses. Manifestly, the more milk that can be sold in Class I and the less in Class III, the greater will be the "blend" price and the more profitable the returns to the members.

A considerable quantity of milk supplied by defendant to its customer-dealers was resold to the Government for use by personnel at Government establishments within the Washington Metropolitan area, such as military and naval stations, Government hospitals, and other institutions. These sales were made by contracts based on competitive bidding. This aspect of the industry, though minor in proportion, was nevertheless of some importance, as Government purchases in the market amounted to about two million dollars a year.

In the Washington Metropolitan area approximately 86 per cent of all sales of fluid milk to dealers were made by the defendant, and about 45 per cent of sales to Federal establishments were made by dealers who procured their supply from the defendant. There were about a dozen dealers, or dairies as they are sometimes called, in the area. All but four purchased the bulk of their supply of fluid milk from the defendant. Among them were the three largest dairies. Embassy Dairy, Incorporated, the fourth largest, was an independent concern and did not buy from the defendant but procured its supply directly from farmers who, in turn, did not sell to the defendant. Wakefield Dairy, a smaller establishment, followed the same course as Embassy.

Embassy sold to Federal installations over 47 per cent of all Government purchases as against about 45 per cent supplied by dealers who, in turn, purchased from the defendant. Embassy obtained such a large share of the Government business by cutting prices and frequently submitting bids lower than those of defendant's dealer customers. Embassy bought its milk from about 122 independent dairy farmers, as against the almost 2000 farmers who were members of the defendant Association. The purchases of Embassy for resale as fluid milk amounted to about 9.5 per cent of the milk supply reaching the Washington Metropolitan area.

■ In the spring of 1954 negotiations were initiated between the defendant and Embassy Dairy, Incorporated, for the acquisition of all of the assets of Embassy Dairy by the defendant Association. While the Government is not required to establish the defendant's motive or intent in entering into this transaction, nevertheless, evidence of motive or intent is admissible as it may possibly cast an illuminating light on what actually transpired. Chief Justice Hughes said, in Texas & N. O. Railroad Co. v. Brotherhood of Railway & S. S. Clerks, 281 U.S. 548, 549, 559, 50 S.Ct. 427, 430, 74 L.Ed. 1034, that:

> "Motive is a persuasive interpreter of equivocal conduct."

In memoranda not intended for public consumption but evidently prepared for private circulation among the directors and members of the Association, as well as for submission to a financial institution from which it was desired to borrow money needed to consummate the transaction, the defendant's general manager frankly, candidly, and without guile or equivocation and without attempt at euphemism, set forth the aims of those who were guiding the destinies of the Association.

In a memorandum dated May 9, 1954, which was introduced in evidence as Plaintiff's Exhibit 22, he said:

"As of April 1, 1954, 1926 farmers were members of the Association. These 1926 farmers were shipping approximately 208,000 gallons of milk daily, which is better than 90 per cent of the entire Metropolitan Washington milk supply. The average farmer markets in excess of 100 gallons of milk daily."

Again, he said, in the same memorandum:

"The Association's customers are the large retail dairies in the Washington Metropolitan area. However, from time to time it happens that these dairies do not absorb the entire amount of milk delivered by the members. In this event the Association undertakes to sell this excess in other markets. This excess is a normal incident to the operation of the cooperative, the reason being that in order to be sure of an adequate supply it must maintain an excess over and above past average requirements."

Further, he stated:

"We believe that the net return to the members is superior to that in any other market, costs of production being taken into consideration."

In the same memorandum he said:

"The benefits expected from the acquisition of Embassy Dairy are as follows:

"1. Elimination of bootlegging, i. e., bringing in cheap uninspected 'distress' milk from other markets.

"2. The elimination of this 'bootleg' milk will allow our own milk to replace it, to the great increase of the blend price.

I will skip Number 3 as immaterial.

"4. Increase in members estimated at 60 to 70 new producers (now selling to Embassy).

"Embassy Dairy does between 8 and 9 million dollars annual business, which business the Association will get and in large part retain. Assuming, however, it loses some of this business, it will lose it to other local dairies who buy from the Association and so the Association would retain the sale of this milk."

And finally this memorandum makes the following significant statement:

"The purchase of Embassy Dairy will eliminate a disturbing influence which has been a thorn in the side of the Association for many years, which the local Health authorities apparently have been unable to control. Acquisition of Embassy Dairy cannot be other than helpful and profitable to the Association."

A memorandum dated June 2, 1954, also prepared by the general manager of the defendant, which has been introduced in evidence as Plaintiff's Exhibit 21, contained somewhat similar statements. The pertinent portions read as follows:

"The Embassy Dairy has for the past 15 years been the major factor involved in the attempts to weaken and destroy the Milk Act of 1925 [D.C.Code 1951, § 33–301 et seq.]."

After making some statements that are here immaterial, the writer goes on as follows:

"In addition to being the leader in the attempts to circumvent and modify the Milk Act and the accompanying regulations, the dairy, through its ability to buy cheap milk both from unlicensed sources and from independent Washington producers, has cut into the market structure to the extent that they have taken considerable sales away from dealers buying milk through the Association.

"As the result of their ability to under-buy the market and thus take away business from dealers purchasing their milk through the Association they have, as a result, reduced

the Association's Class I sales and therefore caused additional surplus to the members of this Association. We estimate that this has amounted to about $700,000 a year loss in revenue to Association producers.

"The effect upon the producer milk checks has not been limited to this loss of sales, but extends to even a greater amount to the contract milk bidding. There is approximately 14,000 gallons of contract milk a day in this Metropolitan market. This milk would normally be classified as Class I and be sold to the distributors at the Class I price. As the result of the dairy's ability to under-buy, therefore under-cut in their bidding, it has been necessary for the Association to drop the contract price to a competitive level, that is, to the price that Embassy is able to buy their milk."

And again the writer says:

"By acquiring this dairy the Association can immediately pick up approximately 8,000 gallons of milk sales for its members for which the dairy has been buying the milk from other than licensed producers on the market."

About six months after the transaction was consummated, the Secretary-Treasurer of the Association expressed similar sentiments in a letter that he wrote to an officer of a similar association in Detroit, Michigan. This letter, dated February 8, 1955, which was introduced in evidence as Plaintiff's Exhibit 48, contains the following statement:

"The first plant we 'inherited' in 1940 was a small one that we had to take over as the result of bankruptcy. The second one which we have just taken over as of August 1, 1954, was one that we felt we had to buy for self protection; the former owners of which had repeated their activities once executed in the Chicago market and since 1930 in the Washington market to the extent that from our standpoint everyone in the distributing field would be happy to have them out of the market. It did give us an additional outlet for a sizable amount of milk which we did not have under prior conditions inasmuch as they were buying independent milk."

The negotiations between the defendant and Embassy Dairy, Incorporated, culminated on July 26, 1954, by a conveyance of the assets of Embassy to the Association, including all of its tangible property, both real and personal, as well as intangible assets. The Embassy Dairy then immediately went out of business. The evidence indicates that the price paid by the Association for the transfer was far in excess of the actual and intrinsic value of the property purchased. To be sure, the rosy prospects previously depicted did not materialize and the optimistic expectations of those in control of the Association were not fully realized. Nevertheless, they were at least partially attained. Apparently the continued existence of several comparatively small dairies kept alive considerable competition in the industry.

After the absorption of Embassy by the defendant, the latter undertook the retail business previously conducted by Embassy, in addition to continuing the functions of the Association as a wholesaler. Many of the independent producers who had supplied Embassy were unable to find an outlet for their product in the Washington market unless they were willing to surrender their independent status and join the Association. Some of them, indeed, pursued the latter course, thereby augmenting the defendant's membership. A large proportion of them, however, began to ship to a Baltimore dealer. Thus, one result of the transaction was that a portion of the fluid milk supply was diverted from the Washington to the Baltimore market, while another consequence was an increase in the amount of milk coming into the defendant's hands.

A still further sequel of the transaction was the elimination of the largest single outlet in the Washington Metro-

politan area for milk produced by independent producers. Immediately after the Embassy acquisition 91.7 per cent of the milk purchased by the Federal government originated directly or indirectly from the defendant, as against 45 per cent that it had indirectly supplied previously. The Embassy Dairy was eliminated completely as a factor from this competitive business.

Thus, the result of the acquisition of Embassy by defendant tended to lessen competition in the milk industry in the Washington market in more ways than one. It diminished competition for the purchase of milk from producers by eliminating one large independent purchaser; it reduced competition for sales to Government establishments by excluding a rival that had been in the habit of cutting prices and under-bidding dealers who bought from the Association; and it tended to create a monopoly by concentrating a larger proportion of the milk supply reaching the Washington area in the hands of the defendant, thereby augmenting the defendant's control or, at least, influence on the market.

It must, indeed, be observed that defendant did not achieve a complete monopoly, for several comparatively small independent dealers still stayed in the market and even prospered. The law, however, is not aimed only at complete monopolies or directed solely at entire elimination of all competition. It is sufficient if the acquisition, merger, or absorption tends to lessen competition or tends to create a monopoly. The conclusion is inescapable that the transaction challenged by the Government in respect to the Embassy Dairy led to each of these consequences. Without doubt, the result was that the defendant enhanced its dominating position in the market, even though it did not attain complete control.

It is argued by able counsel for the defendant that the acquisition of Embassy by the defendant did not reduce the number of dealers in the market but merely resulted in the substitution of another dealer for the one who had been eliminated, in that the business previously conducted ⸱ Embassy was taken over and continued to be operated by the defendant, in addition to the defendant's business as a wholesale distributor. Ingenious as this line of reasoning is, it does not solve the problem. The transaction constituted much more than the replacement of one dealer by another. It was the absorption of the business of the largest independent dealer by the biggest wholesaler in the area and combining the affairs of the two concerns into a single operation, thereby augmenting the influence of the latter in the market and getting rid of a troublesome rival.

So, too, it is no answer to say that milk prices in the area did not climb to a higher level subsequently to the transaction. Prices are affected and influenced by numerous imponderable factors. It is within the realm of possibility that prices might have fallen were it not for the acquisition of Embassy by the Association. The subject of price fluctuations is a topic concerning which the Court cannot speculate.

As an affirmative defense the defendant invokes the last paragraph of Section 7 of the Clayton Act, which reads as follows:

"Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the Civil Aeronautics Board, Federal Communications Commission, Federal Power Commission, Interstate Commerce Commission, the Securities and Exchange Commission in the exercise of its jurisdiction under section 79 of this title, the United States Maritime Commission, or the Secretary of Agriculture under any statutory provision vesting such power in such Commission, Secretary, or Board."

Stripping this provision of those portions that are not material to the issues

in the case at bar, the pertinent language is reduced to the following:

"Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the Secretary of Agriculture under any statutory provision vesting such power in such Secretary."

In support of this defense, defendant introduced evidence to the effect that it applied to a Government financial institution, known as the Baltimore Bank for Cooperatives, for a loan to enable it to carry out the purchase of the Embassy assets and that after scrutinizing the merits of the proposed transaction the Bank made the loan requested by the defendant. The defendant further introduced evidence to the effect that the Marketing Division of the Farmer Cooperative Service of the Department of Agriculture looked into the desirability of the transaction and expressed a favorable opinion.

■■ This evidence does not sustain the defense, for two reasons. First, the statute above quoted exempts only such transactions as are consummated pursuant to authority given by the Secretary of Agriculture "under any statutory provision vesting such power in such * * * Secretary". Admittedly, however, there is no statutory provision empowering the Secretary of Agriculture to approve any transaction such as is involved here. Second, the transaction was not authorized either by the Secretary of Agriculture or by anyone acting in his behalf. The acts and statements of Government officials on which the defendant relies are not sufficient to constitute statutory sanction. Even if they should be deemed to be such representations as might form a basis for an estoppel as between private individuals, this circumstance cannot aid the defendant. It is elementary law that the Government cannot be estopped by statements or acts of any of its officers or agents. Authorities supporting this principle and applying it are legion. Suffice it to cite

two old decisions of the Supreme Court from which the later authorities are derived and on which they are based, In re Floyd Acceptances, 7 Wall. 666, 676, 19 L.Ed. 169; and Wisconsin Central Railroad Co. v. United States, 164 U.S. 190, 210, 17 S.Ct. 45, 41 L.Ed. 399.

The Court, therefore, concludes that the acquisition of the assets of Embassy Dairy, Incorporated, by the defendant, constituted a violation of Section 7 of the Clayton Act and that, consequently, judgment should be rendered compelling the defendant to divest itself of these assets and cancelling all contracts ancillary to the transaction.

A different problem arises in connection with the acquisition of the capital stock of the Richfield-Wakefield Dairies. There are two concerns involved, one known as Richfield, the other one Wakefield. At the time in question, the Richfield Corporation was out of business, but owned and controlled the stock of Wakefield Corporation, or rather Simpson Brothers, Incorporated, which operated the Wakefield Dairy. The evidence establishes without contradiction that at the time when the capital stock of these two corporations was purchased by the defendant the two companies were hopelessly insolvent and were deeply in debt. The defendant was a very large creditor, for an amount exceeding $300,000, for unpaid milk bills. The Wakefield Dairy was in fact on the brink of bankruptcy.

■ The acquisition of capital stock or assets of a failing corporation is not within the ban of Section 7 of the Clayton Act. While the statute does not expressly so provide, this conclusion is inherent in the statutory provision because the acquisition of a failing corporation that is on the verge of going out of business cannot result in lessening competition or in creating a monopoly. Be that as it may, the Supreme Court so held in International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 298, 50 S.Ct. 89, 74 L.Ed. 431.

The Court concludes, therefore, that the acquisition of the capital stock of the

Richfield Dairy Company and Simpson Brothers, Incorporated, was not violative of Section 7 of the Clayton Act.

This opinion will constitute the findings of fact and conclusions of law.

Judgment will be rendered adjudging the acquisition by the defendant of the capital stock of Richfield Dairy Company and Simpson Brothers, Incorporated, to be valid; and further adjudging the acquisition by the defendant of the assets of Embassy Dairy, Incorporated, and the contracts ancillary thereto, to be invalid as in violation of Section 7 of the Clayton Act. The judgment will require the defendant to divest itself within a reasonable time of all assets acquired from Embassy Dairy, Incorporated, and will direct the cancellation of all contracts ancillary to the acquisition. The judgment will further direct the defendant to file a report within sixty days and at such other times as the Court may order, setting forth what steps are being taken to carry out this judgment. The judgment will also provide that applications may be made at the foot of the decree.

Counsel will submit a proposed judgment.