546 F.2d 30
 1977-1 Trade Cases 61,261
 UNIVERSAL BRANDS, INC., etc., Plaintiff-Appellant-Cross Appellee,
v.
PHILIP MORRIS INC., etc., Defendant-Appellee,
Lowenbrau-Munchen Aktiengesellschaft, etc.,
Defendant-Appellee-Cross Appellant.
 No. 75-3855.
 United States Court of Appeals,
Fifth Circuit.
 Jan. 26, 1977.
 
 Cromwell A. Anderson, Miami, Fla., Lawrence Eiger, Robert A. Skirnick, John T. Cusack, Chicago, Ill., for plaintiff-appellant-cross appellee.
 Abe Krash, Murray H. Bring, Irvin B. Nathan, Jonathan D. Schiller, Washington, D. C., Eugene J. T. Flanagan, Associate Gen. Counsel, Philip Morris Inc., for Philip Morris Inc.
 Alan Kanzer, New York City, for Lowenbrau.
 Aubrey V. Kendall, Miami, Fla., for Lowenbrau-Morris.
 Warren H. Dunn, Gen. Counsel, Miller Brewing Co., Milwaukee, Wis., for Miller Brewing Co.
 Appeals from the United States District Court for the Southern District of Florida.
 Before COLEMAN, CLARK and TJOFLAT, Circuit Judges.
 COLEMAN, Circuit Judge:
 
 
 1
 This is a rather unusual antitrust case. The private plaintiff was not enchanted by dreams of treble damages. Defendants candidly admitted all factual allegations. Nevertheless, there was summary judgment for the defendants. We affirm.
 
 
 2
 Alleging violations of Section 1 of the Sherman Act[1] and Section 7 of the Clayton Act,[2] Universal Brands brought suit under Section 16 of the Clayton Act[3] to enjoin the consummation of an agreement, dated April 3, 1974, by which Philip Morris[4] acquired from Lowenbrau the exclusive distributorship of Lowenbrau beer in the United States. Due, however, to an existing distributorship contract between Lowenbrau and Hans Holterbosch, Inc., scheduled to expire April 1, 1975, defendants agreed that initially the newly acquired rights would be limited to a fifteen state region, not including Florida. As to Florida the importation-distribution rights would be delayed until either a termination agreement could be reached between Lowenbrau and Holterbosch or the Holterbosch contract expired, whichever happened the sooner.
 
 
 3
 Holterbosch instituted an action against Lowenbrau for breach of contract and against Philip Morris and Miller Brewing for tortiously inducing the breach. The Supreme Court of the State of New York for New York County held that there had been no extension of the existing contract between Holterbosch and Lowenbrau and that Holterbosch had no contractual rights to import Lowenbrau beer beyond April 1, 1975. Hans Holterbosch, Inc. v. Philip Morris, Inc., et al. (Index No. 10769-74) (March 17, 1975). No appeal was taken.
 
 
 4
 Universal Brands, the plaintiff-appellant had never had a contract with either Lowenbrau or Philip Morris. Instead, it had an arrangement with Holterbosch, by which it purchased Lowenbrau, as desired or needed, from that organization.
 
 
 5
 Upon expiration of Holterbosch's contract with Lowenbrau, Philip Morris began marketing Lowenbrau beer in Florida. In southeast Florida, the area in which the plaintiff had been distributing beer after buying it from Holterbosch, Philip Morris selected three other distributors to market the beer, displacing plaintiff from its former position as sole distributor of this admittedly high-profit product.
 
 
 6
 Understandably disgruntled with this turn of events, plaintiff filed suit against Lowenbrau and Philip Morris, seeking both injunctive and declaratory relief. Lowenbrau challenged the jurisdiction of the District Court, asserting that it was not amenable to the reach of the Florida long arm statute. Upon examination of the factors involved in this issue, we are of the opinion that the District Court erred not in holding against Lowenbrau, Dinsmore v. Martin Blumenthal Associates, Inc., Fla., 314 So.2d 561 (1975); AB CTC v. Morejon, Fla., 324 So.2d 625 (1975).
 
 
 7
 The gravamen of plaintiff's claim is that defendants' 1974 agreement violated the antitrust laws by unreasonably restraining trade and substantially lessening competition in the domestic and imported beer markets in southeast Florida.
 
 Plaintiff's Sherman Act Claims
 
 8
 Contracts and conspiracies in restraint of trade are unlawful, Section 1 of the Sherman Act. Although the statute speaks in terms of "restraint of trade", the courts have long ago concluded that only such conduct as unreasonably restrains trade is to be proscribed. See, e. g., Standard Oil Co. v. United States, 1911, 221 U.S. 1, 61, 31 S.Ct. 502, 55 L.Ed. 619; Chicago Board of Trade v. United States, 1918, 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 638; United States v. Arnold Schwinn & Co., 1967, 388 U.S. 365, 374, 87 S.Ct. 1856, 18 L.Ed.2d 1249.
 
 
 9
 Accordingly, a manufacturer has a right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself. United States v. Colgate & Co., 1919, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992. And it is not a per se violation of the antitrust laws for a manufacturer or supplier to agree with a distributor to give him an exclusive franchise, even if this means terminating another distributor. See United States v. Arnold Schwinn & Co., supra, 388 U.S. at 376, 87 S.Ct. 1856.
 
 
 10
 Moreover, it is not a per se violation for a manufacturer or supplier to contract, combine, or conspire with others to make a change in an existing exclusive franchise, thus cutting off the supply of a former distributor. Burdett Sound, Inc. v. Altec Corporation, 5 Cir. 1975, 515 F.2d 1245, 1248, 1249.
 
 As has been recently stated:
 
 11
 " . . . (I)t is indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B and that such a transfer is valid even though B may have solicited the transfer and even though the seller and B may have agreed prior to the seller's termination of A."
 
 
 12
 Ark. Dental Supply Co. v. Cavitron Corp., 3 Cir. 1972, 461 F.2d 1093, 1094.
 
 
 13
 To like effect, see Burdett Sound, Inc. v. Altec Corporation, supra, 515 F.2d at 1249; Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 9 Cir. 1969, 416 F.2d 71, 78, cert. den., 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755, reh. den., 397 U.S. 1003, 90 S.Ct. 1113, 25 L.Ed.2d 415.
 
 
 14
 This does not mean, however, that a manufacturer's or supplier's discretion as to whom it will sell is unlimited. If the refusal to deal is a device used to acquire a monopoly,[5] or to fix prices,[6] or to establish market dominance and drive out competitors,[7] or is part of a boycott,[8] it is illegal.
 
 
 15
 Viewed in this context, the fallacy of plaintiff's Sherman Act case is apparent. The summary judgment proceedings established no facts that Holterbosch's loss of its distributorship and Universal's loss of its source of supply will have any anti-competitive effect upon the business of selling beer in southeastern Florida. No facts have been either alleged or shown which could support a claim that Philip Morris and Lowenbrau entered into their agreement with an eye toward engaging in any of the prohibited acts mentioned in the preceding paragraphs.
 
 
 16
 Plaintiff did not compete, and had never competed, with either Lowenbrau or Philip Morris. As and when it chose to do so, it merely bought Lowenbrau products from Holterbosch. Any anti-competitive aspects of the defendants' alleged wrongdoing would fall not on plaintiff, but on others, if any, who were national distributors or importers of foreign beers. Admittedly, plaintiff is neither.
 
 
 17
 Additionally, when Universal Brands was not chosen to continue distributing Lowenbrau beer, its place in the distributorship chain was taken by three smaller local distributors, whose combined share of the total area beer market was less than had been enjoyed by the plaintiff.[9] Moreover, after Holterbosch's contract had expired, plaintiff acquired the distributor rights to Becks Beer, another European import.
 
 Plaintiff's Clayton Act Claims
 
 18
 Defendant Philip Morris states that "(t)here is no dispute between plaintiff and defendant as to the controlling legal standard which governs the question of Universal's standing to maintain this antitrust suit". The test relied on by both parties, known as the "target area" test, was set forth in Dailey v. Quality School Plan, Inc., 5 Cir. 1967, 380 F.2d 484, 487-88. However, both parties fail to recognize that this criterion applies only to claims brought under § 4 of the Clayton Act, 15 U.S.C. § 15. And as we noted, plaintiff does not attempt to recover under this section.
 
 
 19
 This Court has recently delineated the important distinctions between an action under § 4 and one under § 16, such as the plaintiff brings.
 
 
 20
 Unlike § 4 of the Clayton Act, § 16 has no business or property requirement. . . . The complainant "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." . . . Moreover, the remedies contained in the two sections are quite distinct. Section 16 carries none of the risk of potentially disastrous monetary judgments or duplicative recoveries. . . . Because of these differences, courts take a less constrained view of standing in suits involving injunctive relief than in those demanding treble damages. . . . To achieve standing under § 16, the petitioner must demonstrate that he is threatened with loss or injury proximately resulting from the antitrust violation.
 
 
 21
 Hence, the pivotal issue for standing under § 16 is proximate cause.
 
 
 22
 Jeffrey v. Southwestern Bell, 5 Cir. 1975, 518 F.2d 1129, 1132 (citations and footnotes omitted) (emphasis added).
 
 
 23
 Under Section 16's standing rule, the plaintiff need only show that he is threatened with injury proximately caused by the defendants. Tugboat, Inc. v. Mobile Towing Co., 5 Cir. 1976, 534 F.2d 1172, 1174. But, as we have observed:
 
 
 24
 A mere showing by the private plaintiff of a violation of the anti-trust laws has no actionable significance because, while in a government action there need be established only an antitrust violation, a private litigant " 'must not only show the violation of the antitrust laws, but show also the impact of the violations upon him,' i. e., some injury (or threatened injury where injunctive relief only is sought) proximately resulting from the antitrust violation."
 
 
 25
 Credit Bureau Reports, Inc. v. Retail Credit Company, 5 Cir. 1973, 476 F.2d 989, 992.
 
 
 26
 It follows then, that if the damage was merely subordinate, incidental or indirect, or if the defendants' alleged antitrust acts are so distant from the injury as to be only remotely causative, plaintiff has not been injured " 'by reason of anything forbidden in the antitrust laws' as contemplated by the Clayton Act". Dailey v. Quality School Plan, Inc., supra, 380 F.2d at 487.
 
 
 27
 What do the undisputed facts establish? Plaintiff has shown that Holterbosch was the exclusive importer and distributor for Lowenbrau beer in the eastern United States, including southeastern Florida; that for a 5-year period, plaintiff purchased Lowenbrau beer from Holterbosch for resale in its area; that Holterbosch's contract with Lowenbrau expired by its own terms on April 1, 1975, and was not renewed; that after that date, Philip Morris became the exclusive United States importer of Lowenbrau beer; and that Philip Morris thereafter appointed three new wholesalers to distribute Lowenbrau beer in southeastern Florida, to the exclusion of plaintiff.
 
 
 28
 The plaintiff's claims of injury are based entirely on business lost when it could no longer buy Lowenbrau beer from Holterbosch. Plaintiff lost its distributorship because Holterbosch no longer had a contract. Even if Holterbosch lost its right of distribution due to the acts of the defendants, the law is clear that "one who is only incidentally injured by a violation of the antitrust laws, the bystander who was hit but not aimed at, cannot recover against the violator." Perkins v. Standard Oil Co., 1969, 395 U.S. 642, 649, 89 S.Ct. 1871, 1875, 23 L.Ed.2d 599 (emphasis in original).
 
 
 29
 Universal's case boils down to an argument that although it had never had a contractual relationship with either Lowenbrau or Philip Morris and had depended solely on a source of supply which dried up on the expiration of the source's contract, an expiration which would have occurred in the absence of any Lowenbrau-Philip Morris contract, it may now bring an antitrust action against those who chose not to give the source a new contract.
 
 
 30
 Moreover, the flow of Lowenbrau to southeast Florida has not been cut off. It has simply been diverted to three distributors, where formerly there had been only one.
 
 
 31
 We know of nothing in the antitrust statutes or corresponding case law which would require either of the defendants to make a new contract with Holterbosch or which would require that either of them enter into a new and hitherto unexisting contract with Universal. The rights of those who manufacture and sell beer in competition with Lowenbrau, or who distribute beer in competition with Philip Morris, are not at stake in this litigation.
 
 
 32
 As we conceive it, there was no genuine issue of material fact which, if resolved in favor of Universal, could have entitled it to recover against either of the appellees. We therefore hold that there was no error in granting summary judgment.
 
 Discovery
 
 33
 Universal Brands vigorously complains of being denied full and complete discovery prior to the entry of summary judgment.
 
 
 34
 On the motions for summary judgment, the defendants conceded as true all of the factual allegations of the complaint and appearing in Universal's answers to interrogatories. Having done this, defendants moved for a stay of discovery pending the resolution of the summary judgment motions. The District Court granted the stay.
 
 
 35
 Universal sought to set aside the stay, so as to allow "complete discovery insofar as it relates to the issues raised by the motions". The District Court held a hearing on Universal's request and asked it to identify any relevant facts which had not been conceded by the defendants, saying that plaintiff would be given every opportunity to take discovery on any such issues. The Court told counsel for Universal:
 
 
 36
 Let's define those issues and then, if we are going to have some discovery on those issues, that is fine. You can let us know what it is and then let us do it.
 
 
 37
 THE COURT: Is that a sound approach or is that out in left field?
 
 
 38
 Does that violate the rights of the plaintiff, because I don't want to do that, either.
 
 
 39
 MR. ANDERSON (counsel for Universal): Not at this point, it certainty doesn't, Your Honor.
 
 
 40
 I have no reason to object to that because it doesn't foreclose us from what we think we are entitled to do. We haven't reached that point.
 
 
 41
 As you say, it might put an insurmountable burden on the defendants.
 
 
 42
 THE COURT: It could, because that is what they are saying.
 
 
 43
 Let us do that. Confer with your attorneys. If you have any quarrel with any of the facts that they say they are relying on, let me know.
 
 
 44
 If you want to take a deposition or two, that is fine, and I will modify the order. If you want to take Williams' deposition, if he is the one that filed an affidavit, I think you are entitled to cross examine somebody who files an affidavit.
 
 
 45
 Given this opportunity to establish those areas into which it desired further discovery, plaintiff responded with a sixteen-page statement, which did not in any way illuminate the areas in which discovery might be helpful to the Court in its task. Nevertheless, the defendants conceded all of the allegations contained in Universal's statement, whereupon the Court left the stay in effect.
 
 
 46
 The District Court gave the plaintiff every opportunity to demonstrate the need for additional discovery. Defendants met every allegation by admitting it to be true. There just was not anything left to "discover" prior to considering summary judgment.
 
 
 47
 There can be no doubt that in appropriate situations plaintiffs in antitrust cases are entitled to discovery prior to the entry of a summary judgment, Littlejohn v. Shell Oil Co., 5 Cir. 1973, en banc, 483 F.2d 1140. Littlejohn likewise teaches, however, see 483 F.2d 1145, that this entitlement lives only so long as there are factors which discovery might clear up, having some bearing on whether summary judgment should be entered. The dispute in Littlejohn was whether there had been as much as one sale in interstate commerce by any defendant. The defendants denied it; the plaintiff said he could not know without discovery. We held that if plaintiff amended his complaint to allege such a sale then he should be allowed to proceed with discovery. That is not the situation we now have before us. Here, defendants conceded all factual points. The question was whether these conceded facts raised an antitrust issue. The stay of discovery was not error, especially not when the Court persisted in calling for some material necessity for discovery and the plaintiff came forward with none.
 
 
 48
 We are of the opinion that the summary judgment was correctly entered and the Judgment of the District Court is
 
 
 49
 AFFIRMED.
 
 TJOFLAT, Circuit Judge (dissenting):
 
 50
 Respectfully, I must dissent. The majority has attempted to put the allegations of the plaintiff into the tidy box constructed by those cases which hold that a manufacturer who simply changes distributors works no violation of the antitrust laws.[1] They do not fit.
 
 
 51
 Universal Brands, Inc., (Universal) does not solely complain of injury to itself. Indeed, the main thrust of the complaint is that Philip Morris, Inc., which wholly owns Miller Brewing Co. (Miller), and Lowenbrau-Munchen Aktiengesellschaft (Lowenbrau) have violated section 1 of the Sherman Act[2] and section 7 of the Clayton Act.[3] Universal attempts to restrain these alleged violations by utilizing section 16 of the Clayton Act.[4] The issues before this court, then, are, first, whether an antitrust violation has been successfully asserted and, second, whether Universal has standing to enjoin such violations.
 
 I. Antitrust Violations
 
 52
 It is no secret that the beer industry is one "marked by a steady trend toward economic concentration." United States v. Pabst Brewing Co., 384 U.S. 546, 550, 86 S.Ct. 1665, 1668, 16 L.Ed.2d 765 (1966). See also United States v. Falstaff Brewing Corp., 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). According to Universal's complaint, which has been accepted as true by the appellees in this summary judgment posture, the number of brewers producing and selling domestic beer in the United States has declined from 121 in 1964 to 58 in 1974. Moreover, while production has increased by 61% since 1950, the number of brewing plants has dwindled from 407 to 129, a 68% reduction. In 1974 the top three brewers made 64% of domestic beer sales, and the top five, including Miller, accounted for 77% of all domestic production.[5] With this background in mind, we must determine whether the record before us presents a material question of fact as to the occurrence of an antitrust violation.
 
 A. Section 1 of the Sherman Act
 
 53
 It is true, as the majority has indicated, that the Sherman Act "does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919). The "Colgate doctrine" however, has been "narrowly limited." United States v. Parke, Davis & Co., 362 U.S. 29, 42, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). See United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); FTC v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); United States v. Schrader's Son, 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920); Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). See generally Areeda, Antitrust Analysis PP 500-36 (2d ed. 1974). A seller may not "by contracts or combinations, express or implied, unduly hinder the free and natural flow of commerce in the channels of interstate trade" without violating the Sherman Act. Bausch & Lomb, 321 U.S. at 722, 64 S.Ct. at 813, quoting Beech-Nut, 257 U.S. at 453, 42 S.Ct. 150.
 
 
 54
 A case instructive on this point is Interphoto Corp. v. Minolta Corp., 295 F.Supp. 711 (S.D.N.Y.), aff'd in part, 417 F.2d 621 (2d Cir. 1969). In that case, Interphoto was a distributor of Minolta photographic equipment. The sales agreement between the parties stipulated thirteen states in which Interphoto could not sell. Moreover, when Interphoto sold cameras below the suggested prices of Minolta, Minolta put pressure on Interphoto and threatened to discontinue dealings. Minolta also informed all its distributors that they were not to sell any equipment to United States military exchanges. When Interphoto did not cooperate, Minolta refused to renew their sales agreement. Interphoto sought injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26 (1970), and prevailed. The Court found the Colgate doctrine inapplicable due to Minolta's price-fixing and territorial and customer restraints. 295 F.Supp. at 718-21.
 
 
 55
 Universal, however, does not allege similar practices by either Lowenbrau or Miller. Lowenbrau was not alleged to have tried to dictate resale prices to Miller nor Miller to its distributors. Neither customer nor territorial restraints nor illegal tying arrangements were alleged. Thus, although summary judgment must be used sparingly in antitrust cases where motive and intent play important roles, Poller v. CBS, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); Broussard v. Socony Mobil Oil Co., 350 F.2d 346 (5th Cir. 1965), I agree with the majority that no facts exist which would tend to show a Sherman Act violation and none have been alleged.[6] Consequently, summary judgment as to the section one violation was in order. See Southern Concrete Co. v. United States Steel Corp., 535 F.2d 313, 318 (5th Cir. 1976).
 
 B. Section 7 of the Clayton Act
 
 56
 To hold that no Sherman Act violation has been asserted does not require a similar conclusion as to section 7 of the Clayton Act, for that section is much broader than the Sherman Act. Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). As the Court stated in Brown Shoe,
 
 
 57
 (I)t is apparent that a keystone in the erection of a barrier to what Congress saw was the rising tide of economic concentration, was (section 7's) provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency. Congress saw the process of concentration in American business as a dynamic force; it sought to assure the Federal Trade Commission and the courts the power to brake this force at its outset and before it gathered momentum. Id. at 317-18, 82 S.Ct. at 1520 (footnote omitted). See also id. at 318 n.32, 82 S.Ct. at 1520.
 
 
 58
 I have already noted the trend toward concentration in the beer industry. The application of section 7 has prevented the mergers of beer companies in the recent past. See Falstaff; Pabst. It seems clear to me that a disputed fact issue exists as to whether the acquisition[7] of Lowenbrau by Miller amounts to a section 7 violation. Miller is the fifth largest brewer in the United States with over 6% of the market. Lowenbrau is the largest importer of beer into the United States. These facts alone should compel a court to question whether the acquisition of Lowenbrau by Miller runs counter to the policy expressed in section 7 by causing an unhealthy concentration of the beer market as a whole in the United States market.[8] An even stronger case is presented when the asserted market area of southeastern Florida, where Miller is the third largest brewer, is considered.[9]
 
 
 59
 Universal also alleges that imported European beer is an appropriate line of commerce for purposes of section 7 analysis. European-style beer differs from domestic beer in many respects, among them being color, alcoholic content and, most importantly, taste. Such differences make European-style beer readily distinguishable from domestic beers. It costs more than domestic beers and provides a higher profit percentage to distributors. This is not to say, of course, that European-style beer must be imported. Indeed, it is Miller's announced intention to brew Lowenbrau in domestic breweries. This graphically demonstrates that Miller, by acquiring all rights to process Lowenbrau in the United States and to use its trademark, has removed itself as a potential competitor of Lowenbrau in the European-style beer market.[10] Such potential competition is also protected by section 7.[11] United States v. General Dynamics Corp., 415 U.S. 486, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974); Falstaff; Pabst; United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964); United States v. Penn-Olin Chemical Co., 378 U.S. 158, 84 S.Ct. 1710, 12 L.Ed.2d 775 (1964); United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); United States v. Phillips Petroleum Co., 367 F.Supp. 1226 (C.D.Cal.1973), aff'd, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).
 
 
 60
 I am not suggesting, of course, that Universal would be able to prove a sufficient section 7 violation to prevail on the merits. But this case is in a summary judgment posture, and allegations and statistics such as those presented here are adequate to demonstrate a prima facie violation of the Clayton Act. General Dynamics, 415 U.S. at 496, 94 S.Ct. 1186. A summary disposition of Universal's claim is improper. Consequently, Universal is entitled to prosecute its claim provided it has standing.II. Standing
 
 
 61
 Universal seeks injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26 (1970), to restrain the alleged section 7 violation. The majority has held that Universal does not have standing to assert such a violation under the section. I disagree.
 
 
 62
 The majority correctly notes that the tests for standing under section 4 and section 16 of the Clayton Act are not identical, for equitable relief is frequently available when treble damages are not.[12] See Hawaii v. Standard Oil Co., 405 U.S. 251, 260-64, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972); Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130-31, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969); In re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122, 130 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973). Section 16 permits suit by any corporation threatened with loss or damage by a violation of the antitrust laws. This circuit has interpreted the statute to mean that the petitioner's loss or damage must have been a proximate result of the antitrust violation. Jeffrey v. Southwestern Bell, 518 F.2d 1129 (5th Cir. 1975); Credit Bureau Reports, Inc. v. Retail Credit Co., 476 F.2d 989 (5th Cir. 1973).
 
 
 63
 I think it clear from Universal's allegations and the evidence it was able to produce despite the district court's stringent limitations on discovery that Universal's injury was approximately caused by the alleged antitrust violation. Philip-Morris' plan from the start was to acquire Lowenbrau and to add it to its Miller line of beers as its European-style product. To this end it would distribute its beers only to its Miller distributors. And that is exactly what happened. Miller took Lowenbrau out of Universal's hands and placed it in those of its three existing distributors.
 
 
 64
 It has long been settled that one does not have to be in privity with an antitrust violator to have standing to bring suit against him. Sanitary Milk Producers v. Bergjans Farm Dairy, Inc., 368 F.2d 679 (8th Cir. 1966); South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir.), cert. denied, 385 U.S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966); Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir. 1955); Vines v. General Outdoor Advertising Co., 171 F.2d 487 (2d Cir. 1948). As was stated in Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948),
 
 
 65
 The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.
 
 
 66
 In my view, Universal has successfully put in issue whether it has been victimized by a forbidden practice. It cannot be conclusively said on this record that Universal has been only "distantly" or "tenuously" injured. Thus, summary judgment is inappropriate. South Carolina Council of Milk Producers, 360 F.2d at 420.
 
 
 67
 The instant case is readily distinguishable from Jeffrey. There residential telephone subscribers were allegedly injured by rates made unnecessarily high because of the defendants' attempts to monopolize the telephone equipment market. The plaintiffs lacked standing to enjoin such violations, however, because manufacturers of telecommunications equipment suffered the "first-line" injury[13] and the city approved the rates as fair. 518 F.2d at 1132. Universal, on the other hand, directly deals with the product which is the subject of alleged antitrust violations. Moreover, no independent governmental authority has been involved.[14]
 
 
 68
 The Ninth Circuit's decision in In re Multidistrict Vehicle Air Pollution graphically demonstrates the difference in standing under section 4 and section 16 and is cogent authority for finding standing in this case. In In re Multidistrict Vehicle Air Pollution several governmental entities and crop farmers alleged that the nation's car manufacturers conspired to eliminate competition among themselves in the research, development, manufacture, installation and patenting of automotive air pollution control devices. The governmental entities claimed losses resulting from diminution in value of government property and other interests; the farmers claimed damage to crop yields. 481 F.2d at 124-25. Applying the "target area" test,[15] the panel found that the farmers' injuries were too remote to confer standing under section 4.[16] Section 16 remedies were available to the plaintiffs, however. The court noted that section 16 "is far broader than § 4. Any person may secure injunctive relief against threatened loss or damage by violation of the antitrust laws." Id. at 130, quoting Hawaii v. Standard Oil Co., 431 F.2d 1282, 1284-85 (9th Cir. 1970), aff'd 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). Accord, Jeffrey, 518 F.2d at 1132.
 
 
 69
 Universal's loss is no more remote than that of the plaintiffs in In re Multidistrict Vehicle Air Pollution. It is a proximate result of the defendants' alleged anticompetitive activity. To be entitled to relief under section 16, a plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." Zenith, 395 U.S. at 130, 89 S.Ct. at 1580. Although the majority has noted the difference in the standing requirements between section 4 and section 16 in theory, it has failed to do so in practice. Universal should be allowed to go forward to demonstrate, if it can, an antitrust violation and to seek appropriate equitable relief.
 
 
 70
 I dissent.
 
 
 
 [1]
 15 U.S.C. § 1
 
 
 [2]
 15 U.S.C. § 18
 
 
 [3]
 15 U.S.C. § 26
 
 
 [4]
 Although Miller Brewing Company is the entity through which Philip Morris conducts its beer operations, we will refer only to Philip Morris for purposes of this discussion
 
 
 [5]
 Burdette Sound, Inc. v. Altec Corporation, supra, 515 F.2d at 1248
 
 
 [6]
 FTC v. Beech-Nut Packing Co., 1922, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307
 
 
 [7]
 Lorain Journal Co. v. United States, 1951, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162
 
 
 [8]
 Klors, Inc. v. Broadway-Hale Stores, Inc., 1959, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741
 
 
 [9]
 Before the switch in distributors, Universal had 16.9% of beer sales in southeast Florida compared to a combined share for the three smaller distributors of approximately 12.8%
 
 
 [1]
 See Burdett Sound, Inc. v. Altec Corp., 515 F.2d 1245 (5th Cir. 1975); Adolph Coors Co. v. FTC, 497 F.2d 1178 (10th Cir. 1974), cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975); Alpha Distrib. Co. v. Jack Daniel Distillery, 454 F.2d 442 (9th Cir. 1972); Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71 (9th Cir. 1969); Scanlan v. Anheuser-Busch, Inc., 388 F.2d 918 (9th Cir.), cert. denied, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968); Ace Beer Distrib., Inc. v. Kohn, Inc., 318 F.2d 283 (6th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963); cf. United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The critical inquiry in refusal to deal cases was well elucidated in Alpha Distributing Co.:
 The critical inquiry in such "refusal to deal" cases is not whether there was a refusal to deal, or whether a refusal to deal was carried out by agreement with others, but rather whether the refusal to deal, manifested by a combination or conspiracy, is so anticompetitive, in purpose or effect, or both, as to be an unreasonable restraint of trade. . . . This inquiry is primarily a factual one, and its resolution often requires determination of motive or intent. 454 F.2d at 452.
 
 
 [2]
 Section 1 states in relevant part, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." 15 U.S.C. § 1 (Supp. IV 1974)
 
 
 [3]
 Section 7 states in relevant part,
 No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. . . . Id. § 18 (1970).
 
 
 [4]
 Section 16 states in relevant part,
 Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue . . . . Id. § 26.
 
 
 [5]
 In United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), the district found that "the number of breweries operating in the United States declined from 714 in 1934 to 229 in 1961, and the total number of different competitors selling beer had fallen from 206 in 1957 to 162 in 1961." Id. at 550. In addition, between 1957 and 1961 the ten leading brewers increased their combined shares of sales from 45% to 53%. Id. at 551, 86 S.Ct. 1665
 
 
 [6]
 It is true that section 1 of the Sherman Act has been used in the past to prevent mergers. E. g., Northern Securities Co. v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679 (1904). However, even assuming for the moment that Lowenbrau has merged with Miller, United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948), would appear to foreclose this avenue of attack by Universal. See also United States v. United States Steel Corp., 251 U.S. 417, 40 S.Ct. 293, 64 L.Ed. 343 (1920). The Columbia Steel decision proved to be a "powerful stimulus" motivating Congress to expand the Clayton Act's coverage in 1950. Areeda, Antitrust Analysis P 620 (2d ed. 1974)
 
 
 [7]
 Under the terms of their contract, Lowenbrau granted Miller the sole and exclusive right to use its trademarks and import it beer. Record at 19-20. Provision was also made for the payment of royalties to Lowenbrau if and when the beer was manufactured by Miller in one of its own domestic breweries. Id. at 25-26. This, for all intents and purposes, amounts to a merger of the two companies in the United States and satisfies section 7's requirement that there be an acquisition of "the whole or any part of the assets of another corporation." United States v. Lever Bros. Co., 216 F.Supp. 887 (S.D.N.Y.1963) (trademark is sufficient asset to trigger section 7); see Western Geophysical Co. v. Bolt Assocs., 305 F.Supp. 1248 (D.Conn.1969) (exclusive patent license); United States v. Columbia Pictures Corp., 189 F.Supp. 153 (S.D.N.Y.1960) (film exhibition rights). See also United States v. ITT Continental Baking Co., 420 U.S. 223, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975)
 
 
 [8]
 Contrary to the intimation of the majority, Universal alleges that competition is restrained in the nation as a whole as well as in southeastern Florida. Record at 8
 
 
 [9]
 As to an appropriate market area, the Supreme Court stated in Brown Shoe, "(A)lthough the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area." 370 U.S. at 337, 82 S.Ct. at 1530. It elucidated further in Pabst that the language of section 7
 requires merely that the Government prove the merger may have a substantial anticompetitive effect somewhere in the United States "in any section" of the United States. This phrase does not call for the delineation of a "section of the country" by metes and bounds as a surveyor would lay off a plot of ground. . . . Certainly the failure of the Government to prove by an army of expert witnesses what constitutes a relevant "economic" or "geographic" market is not an adequate ground on which to dismiss a § 7 case. Compare United States v. Continental Can Co., 378 U.S. 441, 458 (84 S.Ct. 1738, 12 L.Ed.2d 953). Congress did not seem to be troubled about the exact spot where competition might be lessened; it simply intended to outlaw mergers which threatened competition in any or all parts of the country. Proof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial question in this and every § 7 case which is whether a merger may substantially lessen competition anywhere in the United States. 384 U.S. at 549-50, 86 S.Ct. at 1667-68 (footnote omitted). See also United States v. Marine Bancorporation, Inc., 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974); United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966); United States v. Maryland & Virginia Milk Producers Ass'n, 167 F.Supp. 799 (D.D.C.1958), aff'd, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960).
 
 
 [10]
 I realize, of course, that it is initially the task of the district court, and not the court of appeals, to determine whether European-style beer is a distinct line of commerce under section 7. The record before us, however, clearly discloses a fact issue on this point
 
 
 [11]
 Universal alleges in its complaint that, but for the agreement between Miller and Lowenbrau, "Philip Morris would have developed, produced, promoted, sold and distributed its own beer of sufficient quality, prestige and consumer acceptance to complete with Lowenbrau." Record at 6
 
 
 [12]
 This more restrictive approach to standing in treble damages actions is due in large part to the nature of the relief itself. While "one injunction is as effective as 100, and, concomitantly, . . . 100 injunctions are no more effective than one," if a "defendant is sued by 100 different persons . . . and each claim is for damages, the potential liability is obviously far greater than if only one of those persons sued on only one claim." Hawaii v. Standard Oil Co., 405 U.S. 251, 261-62, 92 S.Ct. 885, 889, 31 L.Ed.2d 184 (1972); see Jeffrey v. Southwestern Bell, 518 F.2d 1129, 1132 (5th Cir. 1975)
 
 
 [13]
 Perkins v. Standard Oil Co., 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), warns against attaching any great significance to how far removed from the initial activity the plaintiff happens to be. The court of appeals had denied standing to a plaintiff under the Robinson-Patman Act because his was a "fourth level" injury. In reversing, the Court stated, "We conclude that this limitation is wholly an artificial one and is completely unwarranted by the language or purpose of the Act." Id. at 647, 89 S.Ct. at 1874
 
 
 [14]
 Our decision in Buckley Towers Condominium, Inc. v. Buchwald, 533 F.2d 934 (5th Cir. 1976), is also of no help to the majority. There we denied standing to the plaintiff under both section 4 and section 16 because it could demonstrate no injury at all due to the alleged anticompetitive practices of the defendants. More to the point is our rejection in Credit Bureau Reports of the idea that the antitrust violations of the defendant and the threatened interest of the plaintiff must be in the same market. 476 F.2d at 993-94
 
 
 [15]
 This circuit has also adopted the "target area" approach for determining section 4 standing. See Tugboat, Inc. v. Mobile Towing Co., 534 F.2d 1172 (1976); Dailey v. Quality School Plan, Inc., 380 F.2d 484 (5th Cir. 1967)
 
 
 [16]
 The governmental entities were found not to have standing under section 4 because they alleged no injury to commercial ventures or enterprises as is required under that section, although not under section 16. 481 F.2d at 126, 130; see Hawaii, 405 U.S. at 264, 92 S.Ct. 885