Benjamin J. BUTERA, Plaintiff, Appellant,

v.

SUN OIL COMPANY, INC., Defendant, Appellee.

No. 73–1358.

United States Court of Appeals, First Circuit.

Heard March 4, 1974.

Decided May 2, 1974.

Jordan I. Kobritz, Bangor, Maine, with whom Paine, Lynch, Weatherbee & Kobritz, Bangor, Maine, was on brief, for plaintiff, appellant.

Barbara W. Mather, Philadelphia, Pa., with whom Harold C. Pachios, Portland, Me., Charles J. Bloom, Pepper, Hamilton & Scheetz and Robert M. Dubbs, Philadelphia, Pa., were on brief for defendant, appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Benjamin J. Butera, owner of a retail gasoline station in Bangor, Maine, sued his supplier, Sun Oil Company, Inc., for treble damages, alleging that the "meter reading competitive allowance" (MRCA), Sun's present system of adjusting its wholesale gasoline prices, is tantamount to illegal resale price maintenance in violation of the Sherman Act, 15 U.S.C. § 1 et seq. The district court granted Sun's motion for summary judgment and denied Butera's cross motion. It ruled that Sun had done nothing beyond changing its wholesale prices to influence the retail price at which Butera sold gasoline to the public, and that "more than that must be shown to constitute a violation of Section 1 of the Sherman Act." We affirm.

In 1961 Butera and Sun entered into a Dealer's Agreement under which Sun agreed to sell, and Butera to buy, gasoline, motor oil and the like at Sun's prices. Prior to 1965 Sun's price to dealers for gasoline had two components: a base wholesale "tankwagon" price and a "competitive allowance" (CA), expressed as a discount therefrom and offset at the time of delivery. The CA varied in different marketing areas across the nation, and enabled Sun to adjust its wholesale price in light of the local competitive situation. Sun set the CA so that the wholesale (tankwagon less CA) price enabled its dealers to make what Sun believed a sufficient profit while charging a retail price competitive with rival service stations.

Sun's salesmen and agents would find out the price of gasoline at competitive filling stations, and, perhaps ten times a year, Sun would raise or lower the CA in conformity with market conditions.[1] At the same time it would announce a proportionate change in suggested retail price, but would not require its dealers to follow it; the dealer would remain free to set his own retail price. Butera has no quarrel with the system as so far described. In fact, he asserts that because he has tank capacity in excess of many dealers, he was able to benefit as follows:

"I would buy gasoline at the prevailing price less the CA that was available, I would know what my gasoline cost me, I would check and see what the market was doing by listening, by going—by observation. If the price appeared to be on the downward trend, I would wait until I was at a lower supply of gasoline before I purchased additional supplies. If I had a suspicion that the price was about to go up, I would fill up my tanks to capacity and wait for the price to take effect. If it never did, than I purchased another load at the low price. When the price did move upwards, I stood a chance to make a fairly reasonable substantial profit. That also enabled me to sell gasoline for a period of time at a lower than competition price, because most of them either did not have the means or the ability to seek out and purchase gasoline when the price was low."[2]

Butera's present problem began when Sun, in 1965, adopted the MRCA, under which the dealer is charged the full tankwagon price when a particular delivery is made.[3] Local CAs continue to be

---

1. Sun's district manager deposed that Sun absorbed in the CA 70% of a drop in the local market price, leaving the dealer to absorb 30%.

2. Since the CA was based on what was happening to prices locally, and since it took Sun a while to collate data and respond to the changes, an astute local businessman could perhaps make a shrewd guess what might happen to the CA and act profitably before the change occurred. On the other hand, even Butera's tank would be depleted in about a week, after which the impact of any new CA could not be avoided.

3. Most dealers, including Butera, are not required by Sun to pay for the delivery immediately; when one shipment is made, they must pay for the previous shipment.

established, as above described. However, the CA is not offset against the quantity delivered but rather is credited, after delivery, only against the gallonage the dealer actually sells until such time as a new CA is declared. When that happens the dealer is notified of the new CA, and meters on the pumps are immediately read, establishing the gallonage sold while the earlier CA was in effect and permitting a final credit to be computed for gasoline sold under that CA. The new CA is applied to gas subsequently pumped. Because the effective wholesale price is calculated without regard to the price on the date of delivery to Butera, the MRCA system makes it impossible for him to use his large capacity to engage in speculation. Butera analogizes this to a "consignment" whereby Sun retains control over the wholesale and hence, he contends, retail price even after title has passed.

On the other hand, Butera testified in his deposition that he has continued to set his own retail price and that he was not required to follow Sun's suggested retail price. There is no evidence that MRCA was used invidiously against Butera;[4] on this record it appears to have been applied without discrimination to all Sunoco dealers in the marketing area. The question is thus whether MRCA is by itself an illegal resale price maintenance device. Butera asserts that

"[i]f the retailers do not know the cost of their product until the instant it is sold, and at that time all retailers are paying the same price for the product, then all retailers must of necessity post the same price."[5]

When Sun wants to force its dealers to sell at the "suggested retail price", Butera charges, all Sun need do is adjust the MRCA until compliance is achieved.

The district court rejected this analysis on the ground that "[c]hanges in wholesale prices, of course, inevitably affect retail prices, but more than that must be shown to constitute a violation of Section 1 of the Sherman Act." Although MRCA allows Sun "instantaneous" control over the wholesale price, the court found the type of control not different in kind or effect from Sun's pre-1965 system in which wholesale prices could be varied by Sun more slowly.[6]

■■ Resale price maintenance is, in the absence of state fair trade legislation, a *per se* violation of the antitrust laws. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). But before this doctrine can come into play there must be resale price maintenance. The Supreme Court cases have involved situations in which the attempt to set retail prices was clear. In Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), upon which Butera relies, Union Oil had signed an agreement with the

4. Although there is some hint in Butera's compliant and deposition of a separate claim that Sun officials attempted to coerce Butera individually to maintain Sun's proposed prices, that theory is not pursued on appeal.

5. Sun correctly points out in its brief that this same-price-for-all-dealers predicate is not supported by the record. Nevertheless, the record does not contradict it, and under the Robinson-Patman Act one might suppose that Sun would not charge different prices to different dealers in the same market. Butera's assertion that retailers do not know the cost until "the instant" product is sold is somewhat overstated. The retailer would know the prevailing MRCA, and since these were changed on an average of ten times a year, and then only in response to market changes, he would seem more knowledgeable than represented.

6. Retail service station tank capacity is sufficient, in most cases, to retain supplies for only several days. Thus even prior to the MRCA Sun, while it lacked "instantaneous" control over wholesale prices, could still make rapid changes in the purchase price of inventory. The low-reserve feature of service stations, combined with the volatile motion of gasoline prices, distinguishes them from other industries. In some industries the seller may set prices that do not vary during a business year; with stable prices a retailer cannot speculate or take advantage of large storage capacity.

retailer containing the latter's promise to resell at the price set by Union Oil. In *Kiefer-Stewart* a refusal to sell at a fixed price was met by a concerted refusal to deal. In Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) and United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the retailer was confronted with minimum or maximum prices and harassed by his supplier and others if he stepped out of line. Taken together, these cases suggest that a case of illegal resale price maintenance is made out when a price is announced and some course of action [7] is undertaken or threatened contingent on the willingness or unwillingness of the retailer to adopt the price. The action need not necessarily fit under the rubric "coercion", but it must involve making a meaningful event depend on compliance or non-compliance with the "suggested" or stated price.[8] The dealers in *Parke, Davis* and *Albrecht* were told that the harassment directed against them would end as soon as they acceded to the manufacturer's price desires. The cancellation of the lease in *Simpson* was a direct consequence of the refusal to charge the manufacturer's desired price. The other cases adhere to the same pattern. *Cf.* Lehrman v. Gulf Oil Corp., 464 F.2d 26 (5th Cir.), cert. denied 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); Bowen v. New York News, Inc., 366 F.Supp. 651 (S.D.N.Y.1973).

The dealings between Butera and Sun do not fit within the foregoing pattern. Sun has done nothing, and has threatened nothing, contingent on Butera's adherence to the suggested resale price. MRCA is applied regardless of Butera's own pricing policies. There is no semblance between this case and one such as Pearl Brewing Co. v. Anheuser-Busch, Inc., 339 F.Supp. 945 (S.D.Tex.1972), in which competitive allowances were granted to beer wholesalers upon the implicit (and sometimes explicit) promise that the discounts would be "passed on" to retailers and in turn to consumers. Nor is there any to *Lehrman*, in which "adherence to a suggested price schedule was the *quid pro quo* for Lehrman's receiving Gulf's" competitive allowances. 464 F.2d at 39.

Sun, moreover, does not control Butera's retail prices indirectly by attempting to set Butera's margin. *Cf.* Swettlen v. Wagoner Gas & Oil, Inc., 369 F.Supp. 893 (W.D.Pa.1974). Butera remains free to reduce his margin and try to make more money by underselling his competitors, or he may increase his margin knowing that he will lose sales but hoping to maximize his profit because of the greater per sale income.

Butera argues that whatever his theoretical rights, the costs among filling station operators are virtually identical and that there is, in effect, no opportunity to pursue such economic maneuvers. But a producer's tight control over its wholesale prices does not become resale price maintenance merely because retail outlets to which it sells, being highly competitive and selling at low margins, are sensitive to every change in wholesale prices. Nor can we say that Sun's sophisticated technique for applying current wholesale prices to the

7. The doctrine of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), allows individual sellers to refrain from dealing, even though the condition for dealing might otherwise be in violation of the Sherman Act. But this doctrine has been limited and a violation established "if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy." United States v. Parke, Davis & Co., 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960).

8. We are not so sure as Sun, *see* Gray v. Shell Oil Co., 469 F.2d 742 (9th Cir. 1972), cert. denied 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973), that a violation cannot be found unless Sun "coerced" Butera. *Parke, Davis* condemned anything beyond "mere announcement of . . . policy and the simple refusal to deal". 362 U.S. at 44, 80 S.Ct. at 512. Although the decision in *Simpson* was predicated on the presence of coercive tactics, the Court did not indicate that its absence would have been determinative.

gallonage sold is improper. A producer like Sun may legitimately tailor its wholesale prices to the rise and fall of the market. Butera, indeed, expresses no quarrel with the philosophy underlying CAs; he merely prefers the slack built into the earlier, less efficient system. The use of after-sale credits to adjust the net wholesale price is not *per se* illegal. Such a device would, of course, be illegal if tied in, as was the consignment in *Simpson*, with fixing the retail price charged by Butera to his own customers. But just as a producer may alter its wholesale price from tankload to tankload, it may likewise do so from day to day or gallon to gallon.

The decision as to what margin to use and when to change it, and consequently what retail price to charge remains Butera's, and we agree that such economic impact as follows from Sun's tight control of its own wholesale pricing is not a Sherman Act violation.

Affirmed.