**ALADDIN OIL COMPANY,
Plaintiff-Appellant,**

v.

**TEXACO, INC. and Poweram Oil Co.,
Inc., Defendants-Appellees.**

**No. 77–2554.**

United States Court of Appeals,
Fifth Circuit.

Sept. 28, 1979.

David E. Cherry, Erwin A. Elias, Waco, Tex., for plaintiff-appellant.

Lyndon L. Olson, Waco, Tex., for Power-am Oil Co., Inc.

Cullen Smith, Waco, Tex., M. C. Bradford, Jr., Denver, Colo., Jack D. Childers, Houston, Tex., Lawrence R. Jerz, White Plains, N. Y., for Texaco, Inc.

Before RONEY, TJOFLAT and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

This appeal from the grant of a summary judgment concerns the *Colgate*[1] doctrine of antitrust law. As we are convinced that plaintiff-appellant Aladdin Oil Company made an insufficient showing to withstand the motion for summary judgment of defendants-appellees Texaco, Inc. and Poweram Oil Company, Inc., we affirm.

I.

This case involves the distribution of Texaco gasoline products in the Waco, McLennan County, Texas area. Plaintiff Aladdin Oil Company is one of a group of related corporations with basically common ownership engaged generally in distributing Mobil and Arco gasoline and other automotive products at the wholesale and retail levels in the Waco area.[2] Defendant Texaco, Inc. is a corporation engaged in the production of gasoline and automotive products on a nationwide basis which operates on the wholesale and retail levels in the Waco area. Texaco is the owner of approximately 12 retail gasoline stations in the Waco area in addition to its wholesale distribution operations. Defendant Poweram Oil Company is a corporation engaged in the distribution of Texaco gasoline and automotive products on the wholesale and retail levels in the Waco area.

The events which precipitated this litigation may be simply stated for our purposes.

Early in 1975, a long-time Texaco distributor in the Waco area, Service Oil Company,[3] decided to sell its assets and go out of the petroleum business. As a wholesale and retail distributor of competing products,

Aladdin Oil pursued the opportunity to acquire a Texaco distributorship and entered into negotiations to purchase Service Oil. Aladdin Oil through a corporation which was to be formed to operate the distributorship, was able to reach an agreement with Service Oil for the sale of its business. The sale was subject to two contingencies. First, under the distributorship agreement between Texaco and Service Oil, any sale of the distributorship was subject to the express approval of Texaco, who the parties to this appeal agree could have (1) approved the sale; (2) disapproved the sale; (3) exercised its option to purchase the distributorship at the purchase price agreed on between Service Oil and Aladdin Oil; (4) assigned the purchase option. In addition to the contingency that Texaco approve the sale, the Aladdin Oil-Service Oil agreement provided that the sale was contingent upon Texaco's entering into a full one-year distributorship contract with Aladdin Oil. Soon after reaching this agreement to purchase Service Oil, Aladdin Oil contacted Texaco and requested that Texaco approve the sale and enter into a one-year distributorship agreement. The reactions of Texaco and Poweram Oil serve as the basis of this antitrust suit.

Texaco's local District Marketing Representative in Waco learned of the agreement of purchase between Aladdin Oil and Service Oil near the end of February 1975 when he obtained a copy of the agreement. Through him, representatives of Aladdin Oil arranged to meet with Texaco's District Sales Manager in an effort to obtain Texaco's agreement to waive its purchase option and to accept a new distributor in place of Service Oil. At the scheduled meeting, the Aladdin Oil representatives related the

---

1. The doctrine takes its name from the seminal case of *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

2. We need not detail the complex interrelations among the various entities here loosely referred to as "Aladdin Oil." Since we affirm the summary judgment, we need not decide whether Aladdin Oil has standing to bring this suit as an assignee of the corporate and individual interests who sought to purchase Service Oil and

become a Texaco distributor. 15 U.S.C.A. § 15. We assume, without deciding, that Aladdin Oil has standing. We affirm the summary judgment on the merits. Since there is no antitrust cause of action, we need not concern ourselves further with identifying the proper plaintiff.

3. "Service Oil" will be used here to refer collectively to not only that company but also other affiliates and other trade names.

plans for the formation of a new corporation which would become the Texaco distributor.

Following this meeting, the Texaco District Sales Manager wrote to Texaco's Regional Manager in Houston, advising him of the proposed transaction and outlining the alternatives. He set out his various concerns about the proposal and, after outlining what he deemed were Texaco's alternatives, recommended that Texaco exercise its purchase option, collapse the distributorship, and absorb the Service Oil facilities into its own operations. The handling of the matter was referred to Texaco's Assistant Regional Manager who went to Waco in early March of 1975. He met with the same representatives of Aladdin Oil who had met with the Waco District Marketing Representative. The Assistant Regional Manager reacted negatively to the proposal and he was the first to suggest that Texaco consider assigning its rights under the purchase option to Poweram Oil. To this end, a meeting was arranged with the president of Poweram Oil. At that meeting, the two Texaco officials showed the president of Poweram Oil the Service Oil-Aladdin Oil agreement. They then asked him whether his company would be interested in purchasing Service Oil, if Texaco would assign its option to Poweram Oil. He replied affirmatively.

Upon his return to Houston, the Texaco Assistant Regional Manager briefed his direct supervisor, the Texaco Regional Manager, on developments. He opined that Texaco did not need two distributors in Waco for several reasons which need not concern us. He did not favor, however, the recommendation of the Texaco District Sales Manager that Texaco exercise its purchase option, collapse the distributorship, and absorb the Service Oil facilities into its own operations.

Eventually, the Texaco Regional Manager and the Texaco Assistant Regional Manager concluded that Texaco should assign its purchase option to Poweram Oil. Around the middle of March 1975, such a formal written recommendation was submitted to the New York headquarters of Texaco's Sales Department which detailed several reasons. During the first part of April 1975 the recommendation was approved by the New York office. Service Oil and Poweram Oil were both notified and the purchase option was formally assigned by Texaco to Poweram Oil. Thereafter, Poweram Oil exercised the option and purchased the various assets and properties of Service Oil. Alladin Oil then filed this suit.

Before the District Court, plaintiff alleged *inter alia*[4] that the defendants had conspired to exclude Aladdin Oil to accomplish suppression of intrabrand competition and retail price maintenance. The District Court, after initially denying summary judgment, reversed course and upon reconsideration granted the summary judgment motions of the defendants.

## II.

As a starting point we briefly note the procedural posture in which we find this case: this is a summary judgment entered in an antitrust case.

■ The facile notion pressed upon us that antitrust cases are typically unsuited for summary procedures can be traced to *obiter dictum* in *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The five member majority expressed the following belief:

> We believe that summary [judgment] procedures should be used sparingly in complex antitrust litigation where motive

---

4. Plaintiff's complaint and the District Court's ruling involved alleged violations of Sections 1 and 2 of the Sherman Act. 15 U.S.C.A. §§ 1, 2. Upon defendants prevailing on the federal antitrust claims, the District Court dismissed plaintiff's remaining state law claims. Here, plaintiff has abandoned the Section two claim. Any horizontal implications of the distribution arrangement under Section 1 of the Sherman Act were not part of Aladdin Oil's theory of the case and will not be considered here. The theory of the complaint and the Summary Judgment proceeding was strictly vertical. *But see Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979).

and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'

*Id.* at 473, 82 S.Ct. at 491 (footnote omitted). The four dissenters responded:

Further, the Rule [56] does not indicate that it is to be used any more 'sparingly' in antitrust litigation (*ante*, [368 U.S.] p. 473 [82 S.Ct. 486, p. 491, 7 L.Ed.2d 458]) than in other kinds of litigation, or that its employment in antitrust cases is subject to more stringent criteria than in others. On the contrary, without reflecting in any way upon the good faith of this particular lawsuit, having regard for the special temptations that the statutory private antitrust remedy affords for the institution of vexatious litigation, and the inordinate amount of time that such cases sometimes demand of the trial courts, there is good reason for giving the summary judgment rule its full legitimate sweep in this field.

*Id.* at 478, 82 S.Ct. at 493 (Harlan, J., dissenting). Of course, on the face of Rule 56 the dissenters were inherently correct. There is nothing in Rule 56 itself or in the other Rules or in the Advisory Committee Notes to suggest that Rule 56 does not apply equally to all actions. *See* Federal Practice and Procedure ¶¶ 56.17[1], .17[5], Wright and Miller, Federal Practice and Procedure §§ 2730, 2732. That the Summary Judgment Rule applies to antitrust cases is readily evident from the Supreme Court's later treatment of *First National Bank of Arizona v. Cities Service,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968) in which a writ of *certiorari* was granted to determine whether the summary judgment entered was consistent with the standards announced in *Poller. Id.* at 259, 88 S.Ct. 1575. On receiving a record which took 11 years to create, the Supreme Court concluded

that the defendant had properly supported its motion for summary judgment, and plaintiff, in effect, had merely rested on the allegations of conspiracy contained in the complaint. Over a dissent joined in by three justices, the majority explained that Rule 56 does indeed apply to antitrust suits:

[N]either precedent nor logic supports petitioner's contention that the evidence to which he points is significantly probative of conspiracy and, therefore, we hold that on the facts as shown summary judgment was correctly awarded to respondent.

. . . . .

To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

*Id.* at 288–90, 88 S.Ct. at 1593.

This Court has paid careful attention to these and other Supreme Court pronouncements concerning Rule 56 in antitrust actions. However, simply because a case is based upon the antitrust laws does not suspend the application of Rule 56. The reason summary judgments may seem less common in antitrust cases is because such cases are ripe with issues of motive, intent and credibility which often must be inferred from the total circumstances. Antitrust cases are not necessarily ill-suited for summary procedures; those antitrust cases and any other types of cases which raise genuine issues of motive intent and credibility, however, are suited for a full hearing. *See*

*generally* Moore's Federal Practice and Procedure ¶¶ 56.17[1], .17[5] *and cases cited;* Wright & Miller, Federal Practice and Procedure §§ 2730, 2732 *and cases cited.* This Court has implicitly recognized these principles in decisions in which the opinions express a general concern over misuse of Rule 56 in antitrust cases yet affirm the particular summary judgment being reviewed. *See, e.g., American Telephone and Telegraph Company v. Delta Communications Corporations,* 579 F.2d 972 (5th Cir. 1978) *adopting District Court's opinion at* 408 F.Supp. 1075, 1086 (S.D.Miss.1976) ("Although summary judgment is an available judicial tool in the [field of] antitrust area, *Poller* does warn that it should be cautiously used."), *aff'd on rehearing* 590 F.2d 100 (1979); *Scranton Construction Company v. Litton Industries Leasing Corporation,* 494 F.2d 778, 781 (5th Cir. 1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 774, 42 L.Ed.2d 800 (1975) (footnote omitted) ("Bearing in mind the deservedly high mortality rate of summary dispositions of such litigation as this, and the disfavor with which such disposition are viewed . . . ."); *Littlejohn v. Shell Oil Company,* 483 F.2d 1140, 1145 (5th Cir.) (*en banc*), *cert. denied,* 414 U.S. 1116, 94 S.Ct. 849, 38 L.Ed.2d 743 (1973) ("[This] fatality rate in summarily disposing of litigation in this manner is high indeed, and largely the result of prematurity through inordinate attention to theories of law at a time when the facts have not been fully developed."). Furthermore, this Court has explicitly recognized these principles in *Jones v. Borden Company,* 430 F.2d 568 (5th Cir. 1970), expressing a cognizance "of decisions in this Circuit rejecting summary judgment in cases 'where motive, intent, subjective feelings and reactions, consciousness and conscience [are] to be searched, and examin[ed] and cross-examin[ed are] necessary instruments in obtaining the truth.'" *Id.* at 574 (quoting *Alabama Great Southern R.R. v. Louisville & Nashville*

*R.R.,* 224 F.2d 1, 5 (5th Cir. 1955)). *See also Southern Concrete Company v. United States Steel Corporation,* 535 F.2d 313, 318 (5th Cir. 1976).

Thus, putting aside contrary *caveats* found in *obiter dictum,* we conclude that simply because a suit is brought under the antitrust laws does not foreclose a summary judgment. We agree with Judge Wisdom's borrowed observation: "But the best procedure 'for a correct understanding of summary judgment [is to rely] on the text of the rule, rather than on quotable statements made in one or another case.'" *Jones v. Borden Company,* 430 F.2d at 574 (quoting 3 *W. Barron & A. Holtzoff,* Federal Practice and Procedure § 1232.2 at 114 (C. Wright ed. 1958)).

Rule 56 "contemplates an orderly [procedure] within which to determine whether summary judgment is proper." *Munoz v. International Alliance of the Theatrical Stage Employees and Moving Picture Machine Operators,* 563 F.2d 205, 207 n. 1 (5th Cir. 1977). Once the movant carries its burden of showing that no genuine issue of material fact exists, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *E.g., Save Our Cemeteries v. Archdiocese of New Orleans,* 568 F.2d 1074, 1077 (5th Cir.), *cert. denied,* 439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 133 (1978). It is this shifting burden of going forward which the District Court held Aladdin Oil, the nonmovant here, did not satisfy.[5]

### III.

Aladdin Oil argues that the District Court erred in holding that this case involved nothing more than a wholly unilateral refusal to deal by a seller, Texaco, and the choice of one replacement distributor, Poweram Oil, instead of another potential replacement distributor, Aladdin Oil, based on legitimate reasons. We agree with the District Court.

---

**5.** The District Court's terse Order Granting Summary Judgment concludes:

Despite Plaintiff's allegation that Defendants' conduct in this case fell within an exception to this general rule [*Colgate* doctrine], Plain-

tiff has failed to come forward with sufficient factual material to show that there is a genuine issue for trial, as required by Fed.R.Civ.P. 56(e). Thus, summary judgment for Defendants is proper.

■ Section 1 of the Sherman Act makes illegal "[e]very contract, combination . . . or conspiracy, in restraint of trade." 15 U.S.C.A. § 1. Although the statute speaks in terms of *every* concerted restraint, the courts have long interpreted this language to prohibit concerted activity which *unreasonably* restrains trade. *See, e.g., Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). Only when concerted activity is manifestly anti-competitive are *per se* rules of illegality applicable. *See, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 2557–58, 53 L.Ed.2d 568 (1977); *Northern Pac. R. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178 (5th Cir. 1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

■ Accordingly, a seller has a unilateral right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself. The seminal decision in this area is *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). The case came to the Supreme Court on a writ of error from a District Court judgment dismissing an indictment under the Sherman Act. The indictment was based solely on the theory that Colgate & Co. had combined with its wholesale and retail dealers to effect resale price maintenance and had procured adherence through refusals to deal. The District Court interpreted the indictment *not* to allege any agreement to maintain resale prices between Colgate & Co. and its customers. The Supreme Court held itself bound by this interpretation of the indictment. Affirming the District Court, the Supreme Court held:

> The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.

*Id.* at 307, 39 S.Ct. at 468. This is the now-famous *Colgate* doctrine. Although formally grounded on the broad premise that a seller who makes no promise is contractually free to alienate its own goods, the *Colgate* doctrine has evolved into a much narrower concept. Despite critical Supreme Court narrowing[6] and commenta-

---

6. The Supreme Court has repeatedly narrowed the *Colgate* doctrine, but has never overruled the precedent. *See, e.g., Continental T.V., Inc. v. GTE Sylvania,* 433 U.S. 36, 97 S.Ct. 2549, 2567–68, 53 L.Ed.2d 568 (1977) (White, J., concurring); *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365 (1967); *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Simpson v. Union, Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *FTC v. Simplicity Pattern Co., Inc.,* 360 U.S. 55, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959); *Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *United States v. Bausch & Lomb Optical Co.,* 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *Ethyl Gasoline Corp. v. United States,* 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852 (1940); *FTC v. Beech-Nut Packing Co.,* 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); *Frey & Son, Inc. v. Cudahy Packing Co.,* 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892 (1921); *United States v. A. Shrader's Son, Inc.,* 252 U.S. 85, 40 S.Ct. 251, 64 L.Ed. 471 (1920). This consistent narrowing once led Judge Moore to observe: "The Supreme Court has left a narrow channel through which a manufacturer may pass even though the facts would have to be of such Doric simplicity as to be somewhat rare in this day of complex business enterprise." *George W. Warner & Co. v. Black & Decker Manufacturing Co.,* 277 F.2d 787, 790 (2d Cir. 1960).

tor criticism,[7] the *Colgate* doctrine remains viable in antitrust law. Its continued viability has been recognized in recent decisions by all our sibling Circuits[8] and in a long line of decisions by this Court.[9] The *Colgate* doctrine still allows individual sellers to refrain from dealing, even though the condition for dealing would otherwise violate the antitrust laws. However, the unilateral right to select customers is narrowly circumscribed to permit only the "mere announcement of . . . policy and the simple refusal to deal." *United States v. Parke, Davis & Co.*, 362 U.S. 29, 44, 80 S.Ct. 503, 512, 4 L.Ed.2d 505 (1960).

Before the District Court and on this appeal, Aladdin Oil has urged that the concerted activity necessary for an antitrust violation was established by the scenario of events previously outlined. The District Court artificially isolated Texaco's refusal to grant Aladdin Oil a distributorship from Texaco's assignment of its purchase option to Poweram Oil. Reasoning that Texaco could have refused to grant Aladdin Oil a distributorship without regard to whether a first refusal purchase option even existed, the District Court concluded that Texaco's

refusal to make Aladdin Oil one of its distributors should be isolated and separately considered under Section 1. Thus, isolated, the refusal to make Aladdin Oil a distributor was viewed by the District Court as a decision protected under the *Colgate* doctrine. This was too mechanical an approach. What Texaco had the abstract power to do does not control. Our inquiry must examine what Aladdin Oil alleged and sought to prove actually transpired between Texaco and Poweram Oil. Even thus viewed, however, we believe that Aladdin Oil has not established the existence of a genuine issue of material fact. We agree with Aladdin Oil that the conduct of Texaco and Poweram Oil must be considered together.

Aladdin Oil misapprehends the law, however, if it contends that this joint conduct, without more, violates the antitrust laws. The Court of Appeals for the Ninth Circuit best explained how the *Colgate* doctrine applies to such situations:

> We think it indisputable that a single manufacturer or seller can ordinarily stop doing business with A and transfer his business to B. All of the cases cited

7. *See, e.g.*, Barber, *Refusals to Deal Under the Federal Antitrust Laws*, 103 *U.Pa.L.Rev.* 847 (1955); Fulda, *Individual Refusals to Deal: When Does Single-Firm Conduct become Vertical Restraint?* 30 *Law & Contemp.Probs.* 590 (1965); Isac, *Unilateral Refusals to Deal: King Colgate is Dead!*, 30 *Ohio St.L.J.* 537 (1969); Levi, *The Parke, Davis—Colgate Doctrine: The Ban on Resale Price Maintenance*, 1960 Sup.Ct. Rev. 258; Parker, *Individual Refusals to Sell in Regulated Industries*, 41 *Tex.L.Rev.* 295 (1962); Pitofsky & Dam, *Is the Colgate Doctrine Dead?* 37 *Antitrust L.J.* 772 (1968). *See also generally* Areeda, *Antitrust Analysis* ¶¶ 524–531 (2d ed. 1974); Sullivan, *Antitrust* §§ 137–141 (1977); Annotation, *Refusals to Deal as Violations of the Federal Antitrust Laws*, 41 A.L.R.Fed. 174 (1979) and cases cited; 58 C.J.S. § 49 and cases cited.

8. *See, e.g.*, *Lamb's Patio Theatre, Inc. v. Universal Film Exchange, Inc.*, 582 F.2d 1068 (7th Cir. 1978); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir.), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *Fount-Wip Inc. v. Reddi-Wip Inc.*, 568 F.2d 1296 (9th Cir. 1978); *Quality Mercury Inc. v. Ford Motor Co.*, 542 F.2d 466 (8th Cir. 1976); *Venzie Corp. v. United States Mineral Products Co.*, 521 F.2d 1309 (3d Cir. 1975); *Brandeis Machinery &*

*Supply Corp. v. State Equipment Co.*, 503 F.2d 503 (7th Cir. 1974); *Adolph Coors Co. v. FTC*, 497 F.2d 1178 (10th Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975); *Butera v. Sun Oil Co.*, 496 F.2d 434 (1st Cir. 1974); *Amplex of Maryland Inc. v. Outboard Marine Co.*, 380 F.2d 112 (4th Cir.), *cert. denied*, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1967); *Dart Drug Co. v. Parke, Davis & Co.*, 120 U.S.App.D.C. 79, 344 F.2d 173 (D.C. Cir. 1965).

9. *See, e.g.*, *Daniels v. All Steel Equipment, Inc.*, 590 F.2d 111 (5th Cir. 1979); *Fulton v. Hecht*, 580 F.2d 1243 (5th Cir. 1978); *Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824 (5th Cir. 1978); *Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30 (5th Cir. 1977); *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir. 1975); *Weather Wise Co. v. Aeroquip Corp.*, 468 F.2d 716 (5th Cir. 1972), *cert. denied*, 410 U.S. 990, 93 S.Ct. 1505, 36 L.Ed.2d 188 (1973); *Guidry v. Continental Oil Co.*, 350 F.2d 342 (5th Cir. 1965); *Associated Beverages Co. v. P. Ballantine & Sons*, 287 F.2d 261 (5th Cir. 1961); *Nelson Radio & Supply Co. v. Motorola, Inc.*, 200 F.2d 911 (5th Cir. 1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953).

[above] stand for this rule. The rule is also expressly recognized in the cases upon which appellee relies, and which we have discussed. There is language in many of those cases which, taken out of context, plaintiff construes as meaning that, if the seller agrees with a third party—a competitor of the seller, for example, or a competitor of A—to do the same thing, a *per se* violation of section 1 has occurred. This obviously cannot mean an agreement with B, the new distributor; he could not accept the distributorship without agreeing to do so. And the decisions cited [above] make it clear that the decision of the seller to transfer his business from A to B is valid even though B may have solicited the transfer and even though the seller and B may have agreed before the seller terminates his dealings with A. No case cited to us, and none that we have found, actually goes so far as plaintiff claims.

*Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 78 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). *See also Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30, 33 (5th Cir. 1977); *Quality Mercury, Inc. v. Ford Motor Co.*, 542 F.2d 466, 469 (8th Cir. 1976); *Dreibus v. Wilson*, 529 F.2d 170, 173–74 (9th Cir. 1975); *Bowen v. New York News, Inc.*, 522 F.2d 1242, 1245 (2d Cir. 1975); *Burdett Sound, Inc. v. Atlec Corp.*, 515 F.2d 1245, 1248–49 (5th Cir. 1975); *Ark Dental Supply Co. v. Cavitron Corp.*, 461 F.2d 1093, 1094 (3d Cir. 1972);

*Ricchetti v. Meister Brau, Inc.*, 431 F.2d 1211, 1214 (9th Cir. 1970).

■  We believe this analysis controls. Under this analysis, Texaco's assignment of the Service Oil purchase option to Poweram Oil and Texaco's refusal to grant Aladdin Oil a distributorship are unilateral decisions protected by the *Colgate* doctrine. The role Poweram Oil played does not render the *Colgate* doctrine inapplicable. We see no significance in the distinction between a seller negotiating with one existing customer to transfer the complete business of another existing customer, thus eliminating a customer, and the situation here. Here a seller negotiated with an existing customer, Poweram Oil, to transfer the complete business of a customer going out of business, Service Oil, while, at the same time, the attempt of a potential customer, Aladdin Oil, to establish a customer relationship was denied.

■■  Still, sellers do not have an antitrust *carte blanche* to select those with whom they will deal. On the contrary, a refusal to deal becomes unlawful when it produces an unreasonable restraint on trade, *i.e.*, if there is an anticompetitive purpose or effect in selecting those with whom one will deal. A refusal to deal may not be used as a device to achieve some anticompetitive goal such as to acquire a monopoly,[10] or to fix prices,[11] or to establish market dominance and drive out existing competitors,[12] or to aid the enforcement of unlawful resale price restrictions and territorial allocations,[13] or to increase the seller's

---

10. *See, e.g., Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30, 33 (5th Cir. 1977); *Burdett Sound, Inc. v. Atlec Corp.*, 515 F.2d 1245, 1248 (5th Cir. 1975); *National Screen Service Corp. v. The Poster Exchange, Inc.*, 305 F.2d 647, 651 (5th Cir. 1962).

11. *See, e.g., FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); *Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186, 1192 (5th Cir. 1978); *Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30, 33 (5th Cir. 1977); *Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d 934, 946 (5th Cir. 1975).

12. *See, e.g., Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162

(1951); *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83, 87 (5th Cir. 1978); *Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824, 828 (5th Cir. 1978); *Aviation Specialties, Inc. v. United Technologies Corp.*, 568 F.2d 1186, 1192 (5th Cir. 1978); *Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30, 33 (5th Cir. 1977); *E. A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee*, 467 F.2d 178 (5th Cir. 1972), *cert. denied*, 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

13. *See, e.g., Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979); *Dougherty v. Continental Oil Co.*, 579 F.2d 954, 961 n. 3 (5th Cir. 1978).

own market dominance,[14] or to enforce a boycott,[15] or to promote the predatory practices of the seller.[16] This requirement of illegitimate purpose or effect marks the distinction between concerted activity which is an innocent aspect of business and concerted activity which is inimical to competition.[17]

Aladdin Oil has sought to attribute such an anticompetitive *animus* to Texaco and Poweram Oil by alleging that Texaco's disapproval of Aladdin Oil as a distributor and the assignment of the Service Oil first refusal purchase option to Poweram Oil were designed to lessen intrabrand competition and further a system of retail price maintenance.[18]

■ Aladdin Oil's allegation of suppression of intrabrand competition is nothing more than inartful speculation. As best we can understand this allegation, we can discern no support for it in this record. Here, Texaco did not substitute a new distributor for Service Oil. Instead, Poweram Oil purchased Service Oil. To this extent, intrabrand competition in Texaco gasoline was reduced. However, this distinction from the more usual refusal to deal case does not require the application of any stricter rule. A seller may have just as valid reasons for reducing the number of purchasers as for changing purchasers. *See Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir. 1978) *commented on in* 92 Harv.L.Rev. 1160 (1979). Precedents establish that abstract lessening of intrabrand competition is not enough. Even a concerted intent to eliminate an exclusive distributor does not necessarily establish a cause of action for violation of the antitrust laws. "[A] reduction in intrabrand competition is not pernicious as long as there exists interbrand competition, which acts as a 'significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product.'" *Daniels v. All Steel Equipment, Inc.*, 590 F.2d 111, 113 (5th Cir. 1979) (quot-

---

14. *See, e.g., Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Dougherty v. Continental Oil Co.*, 579 F.2d 954, 961 n. 3 (5th Cir. 1978).

15. *See, e.g., Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30, 33 (5th Cir. 1977).

16. *See, e.g., Dougherty v. Continental Oil Co.*, 579 F.2d 954, 961 n. 3 (5th Cir. 1978); *Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336 (9th Cir. 1970).

17. This distinction was made in Barber, *Refusals to Deal Under the Federal Antitrust Laws*, 103 *U.Pa.L.Rev.* 847 (1955):

When the element of purpose to coerce the trade policy of third parties or to secure their removal from competition is absent, the policy question raised by agreements under which the parties mutually limit their own freedom to deal with outsiders becomes more difficult, and the courts have appropriately outlined wider limits before declaring such agreements illegal.

There are many 'normal and usual agreements in aid of trade and commerce,' * * which involve the acceptance by the parties of limitations on their freedom individually to deal with others * * *. Requirements contracts, exclusive dealing contracts and contracts involving exclusive territories all involve limitations on the freedom of one or more of the parties to do business with others * * *.

Because all of these situations involve an agreement between two or more persons under which one or more of them agree not to deal with third persons and for that reason foreclose a part of the market to such third persons, they are all subject to scrutiny under the antitrust laws. But in the ordinary case these do not involve combining for the primary purpose of coercing or excluding; rather they involve combinations of two or more persons to further directly the business of the parties to the agreement, and the effect on third parties and on competition is indirect. The issue in these cases is not the existence or nonexistence of concerted refusal to deal, but rather whether the purpose and effect of the operation of the contract, association, exchange or joint sales agency was such as unreasonably to exclude outsiders from participation in the trade in question. The principle of the group boycott cases—that it is prima facie unreasonable for a dominant group to combine to coerce—is not here applicable.

*Id.* at 876–77, *quoted in Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.*, 416 F.2d 71, 77 (9th Cir. 1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

18. *See note 5, supra.*

ing *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n. 19, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977)). *See also Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.) (*en banc*), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); *Northwest Power Products, Inc. v. Omark Industries*, 576 F.2d 83, 87 (5th Cir. 1978); *Dillon Materials Handling Inc. v. Albion Industries*, 567 F.2d 1299 (5th Cir.), *cert. denied*, 439 U.S. 832, 99 S.Ct. 111, 58 L.Ed.2d 127 (1978); *Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30, 33 (5th Cir. 1977); *Dreibus v. Wilson*, 529 F.2d 170 (9th Cir. 1975). *But cf. Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979). The law is clear that merely changing from one exclusive distributor to another is permitted. *A fortiori*, it must be permissible for one distributor going out of business to be purchased by an existing distributor rather than by a new and different distributor. And, under the precedents discussed above, the prior arrangements Texaco made with Poweram Oil were permitted. Thus, there is no merit in Aladdin Oil's theory of suppression of intrabrand competition.

■ Just as fanciful is Aladdin Oil's claim that somehow the issue of retail price maintenance is involved in this case. The record demonstrates to the contrary. The District Court held that Aladdin Oil did not bring forth sufficient factual material on the retail price maintenance issue to show there was a genuine issue for trial as required by Fed.R.Civ.P. 56(e).[19] We agree.

■ Of course, Aladdin Oil's allegations of retail price maintenance alone were not sufficient to escape summary judgment. There must be a sufficient quantum of proof to carry an issue of material fact to the jury. Here there is no direct evidence that Texaco and Poweram Oil acted as they did in furtherance of a scheme violative of the antitrust laws. Rarely, if ever, can a plaintiff point to a "smoking gun" in cases such as this. Yet, a plaintiff must convince the court that it is reasonable to infer the existence of the gun from the facts shown.

This Aladdin Oil did not do, either in the District Court or in this Court. *See American Telephone and Telegraph Co. v. Delta Communications Corp.*, 590 F.2d 100, 102 (5th Cir. 1979).

In *Butera v. Sun Oil Co.*, 496 F.2d 434 (1st Cir. 1974), an owner of a retail gasoline station sued his supplier and alleged that the supplier's method of adjusting its wholesale gasoline prices was tantamount to illegal resale price maintenance. The Court of Appeals for the First Circuit affirmed the summary judgment in favor of the supplier. In its analysis, the First Circuit distilled from the authorities the essence of a resale price maintenance cause of action:

Resale price maintenance is, in the absence of state fair trade legislation, a *per se* violation of the antitrust laws. *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.*, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). But before this doctrine can come into play there must be resale price maintenance. The Supreme Court cases have involved situations in which the attempt to set retail prices was clear. In *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), upon which [plaintiff] relies, Union Oil had signed an agreement with the retailer containing the latter's promise to resell at the price set by Union Oil. In *Kiefer-Stewart* a refusal to sell at a fixed price was met by a concerted refusal to deal. In *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) and *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the retailer was confronted with minimum or maximum prices and harassed by his supplier and others if he stepped out of line. Taken together, these cases suggest that a case of illegal resale price maintenance is made out when a price is announced and some course of action is undertaken or threatened contingent on the willingness

---

**19.** *See* note 5, *supra.*

or unwillingness of the retailer to adopt the price. The action need not necessarily fit under the rubric "coercion", but it must involve making a meaningful event depend on compliance or non-compliance with the 'suggested' or stated price. The dealers in *Parke, Davis* and *Albrecht* were told that the harassment directed against them would end as soon as they acceded to the manufacturer's price desires. The cancellation of the lease in *Simpson* was a direct consequence of the refusal to charge the manufacturer's desired price. The other cases adhere to the same pattern. *Cf. Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir.), *cert. denied* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); *Bowen v. New York News, Inc.*, 366 F.Supp. 651 (S.D.N.Y.1973).

*Id.* at 436–37 (footnotes omitted). *See also Broussard v. Socony Mobil Oil Co.*, 350 F.2d 346 (5th Cir. 1965). Following this analysis, the First Circuit concluded that there was no resale price maintenance involved. We follow this same analysis to the same result here.

Aladdin Oil has alleged that Texaco and Poweram Oil conspired to maintain resale prices. No announcement of prices has been shown. No "course of action [was] undertaken or threatened contingent on the willingness or unwillingness of [Aladdin Oil] to adopt the price." 496 F.2d at 437. There was no "meaningful event [dependent] on compliance or non-compliance." *Id.* Here Texaco refused to deal with Aladdin Oil and arranged with Poweram Oil to take over Service Oil. There was nothing beyond this. There was no resale price maintenance which occurs only "if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy." *United States v. Parke, Davis & Co.*, 362 U.S. 29, 43, 80 S.Ct. 503, 511, 4 L.Ed.2d 505 (1960). We reach this conclusion after careful review of the record and Aladdin Oil's allegations. We conclude that summary judg-ment was proper here. *See Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824 (5th Cir. 1978); *Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30 (5th Cir. 1977); *Copper Liquor, Inc. v. Adolph Coors Co.*, 506 F.2d 934 (5th Cir.), *on rehearing*, 509 F.2d 758 (1975); *Butera v. Sun Oil Co.*, 496 F.2d 434 (1st Cir. 1974); *Broussard v. Socony Mobil Oil Co.*, 350 F.2d 346 (5th Cir. 1965); *Guidry v. Continental Oil Co.*, 350 F.2d 342 (5th Cir. 1965).

Since we find no merit in any of the contentions raised on appeal, the summary judgment is

AFFIRMED.