**GENERAL CHEMICALS, INC.,**
Plaintiff-Appellant,

v.

**EXXON CHEMICAL COMPANY, USA,**
et al., Defendants-Appellees.

No. 78–2819.

United States Court of Appeals,
Fifth Circuit.

Sept. 18, 1980.

Baggett, McCall, Singleton, Ranier & Ieyoub, J. Michael Veron, Drew A. Ranier, Lake Charles, La., for plaintiff-appellant.

Stockwell, Sievert, Viccellio, Clements & Shaddock, William E. Shaddock, Oliver P. Stockwell, Lake Charles, La., for Exxon, Martin, Dyer, Miller, Perlman & Baranski.

Jones, Patin, Harper, Tete & Nolen, Kenneth R. Spears, Lake Charles, La., for Bamberger Molding & Bamberger.

Before THORNBERRY, FRANK M. JOHNSON, Jr. and HENDERSON, Circuit Judges.

HENDERSON, Circuit Judge;

The appellant filed this antitrust action for damages in the United States District Court for the Western District of Louisiana, against Exxon Chemical Company USA (hereinafter referred to as "Exxon"), Claude Bamberger Molding Compounds Corporation (hereinafter referred to as "Bamberger Compounds"), Claude Bamberger and other individual employees and officers of Exxon. The district court granted summary judgment to all the defendants and the plaintiff, General Chemicals, Inc., appealed. We affirm.

As an incident to the operation of its chemical refinery at Baton Rouge, Louisiana, Exxon produces approximately five million tons per year of low-density polyethylene scrap. Although this scrap has some value, especially in such great volume, it is something of a nuisance to Exxon, which has no place to store it. Consequently, a major, if not primary, consideration in deciding whom to sell the scrap is the potential buyer's ability to move it on demand.

For a while Exxon sold all its scrap to Bamberger Compounds. The rapid rise in the cost of oil during the early 1970's was reflected in scrap prices, and Exxon began to take bids on a quarterly basis. Early in 1975 it accepted bids for the following three quarters. Bamberger Compounds was the high bidder. However, Bamberger Compounds was unable to move the scrap expeditiously, and new bids were solicited for the fourth quarter of 1975. General Chemicals, Inc., was the high bidder in this bidding, but was only awarded part of the

scrap. Bamberger Compounds, despite submitting a lower bid, received approximately twice as much scrap as the appellant. Each lot of scrap was sold at the price its purchaser bid, so Bamberger Compounds paid less per pound than General Chemicals, Inc. The allocation for the first quarter of 1976 was similar; but for the second quarter the bid of General Chemicals, Inc., was lower than that of Bamberger Compounds, and Exxon sold Bamberger Compounds all the scrap.

Thereafter General Chemicals, Inc., brought this suit, seeking recovery for (1) a conspiracy between Bamberger Compounds and Exxon to exclude General Chemicals, Inc., from the scrap market, in violation of § 1 of the Sherman Act, 15 U.S.C.A. § 1; (2) breach of contract; and (3) fraud. General Chemicals, Inc., dropped the fraud count in its first amended complaint. Each of the defendants subsequently moved for summary judgment, claiming that Exxon was free to give its business to whomever it chose and that the plaintiff had entirely failed to come forward with evidence of a conspiracy. Before these motions were decided, the plaintiff again amended the complaint, with leave of the court, to allege that the sales to Bamberger Compounds at prices lower than those charged General Chemicals, Inc., violated § 2(a) of the Robinson-Patman Act, 15 U.S.C.A. § 13(a).[1] Responding thereto, the defendants asserted that Bamberger Compounds sent all scrap it purchased to Hong Kong immediately upon delivery, therefore exempting it from act's coverage.

In granting summary judgment to the defendants the court noted that Exxon "has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself," quoting *Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824, 827 (5th Cir. 1978). He went on to "find that no evidence has been presented to indicate or prove that the defendants were engaged in an unlawful combination and conspiracy to restrain and monopolize the chemical scrap business." Opinion of

1. Hereafter all citations are to the U.S.C.A. only.

June 20, 1978, at 4. The court did not mention the price-discrimination claim,[2] but the opinion clearly granted summary judgment on all causes, and the parties have so interpreted it.[3]

Although "summary [judgment] procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles," *Poller v. Columbia Broadcasting Systems*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962), we are satisfied that the grant of summary judgment was warranted here. *See generally, First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *S&M Materials Co. v. Southern Stone Co.*, 612 F.2d 198 (5th Cir. 1980); *Alladin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107 (5th Cir. 1979).

■ The appellant's Sherman Act cause of action may be fairly stated as follows: Exxon and Bamberger Compounds conspired to drive General Chemicals, Inc., from the scrap business and attempted to effectuate the plan by selling Bamberger Compounds the scrap to the exclusion of General Chemicals, Inc. There can be no argument but that Exxon was free to give its business to whomever it chose, so long as it was not motivated by an anti-competitive purpose. *United States v. Parke, Davis and Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Colgate and Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Alladin Oil Co.; Southern Distributing Co.* on the other hand,

> sellers do not have an antitrust *carte blanche* to select those with whom they will deal. On the contrary, a refusal to deal becomes unlawful when it produces an unreasonable restraint on trade, *i. e.*, if there is an anti-competitive purpose or

effect in selecting those with whom one will deal. A refusal to deal may not be used as a device to achieve some anticompetitive goal such as to acquire a monopoly, or to fix prices, or to establish market dominance  .  .  ..

*Alladin Oil Co.*, 603 F.2d at 1115 (footnotes omitted).

The question, then, is whether illegitimate considerations were behind Exxon's choice of customers. The appellant urges that Exxon's decision to sell scrap to Bamberger Compounds at a price less than that General Chemicals, Inc., was willing and able to pay implies that there existed a conspiracy to eliminate competition. Because this is an insupportable inference summary judgment was proper.

■ The major factual question in this case is whether there was a conspiracy. Even a successful antitrust plaintiff will seldom be able to offer a direct evidence of a conspiracy and such evidence is not a requirement. *See, e. g., Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 703–04, 89 S.Ct. 1391, 1393, 22 L.Ed.2d 658 (1969). However, to survive a motion for summary judgment the evidence must suggest reasonable inferences of conspiracy. *Cities Service Co.; American Telephone & Telegraph Co. v. Delta Communications Corp.*, 590 F.2d 100, 102 (5th Cir.), cert. denied, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). "Rarely, if ever, can a plaintiff point to a 'smoking gun' in [conspiracy] cases such as this. Yet, a plaintiff must convince the court that it is reasonable to infer the existence of the gun from the facts shown." *Alladin Oil Co.*, 603 F.2d at 1117.

2. The explanation for this oversight may be that the complaint was amended to include the Robinson-Patman cause of action after the defendants had already moved for summary judgment.

3. Nor does the order discuss the alleged breach of contract. The appellant did not even raise the issue in its appellate brief. The first mention of the contract claim, was in the appellant's reply brief: "Briefly, General Chemicals contends that there was an offer made to sell all of the products to the higher bidder, General Chemicals accepted this offer as the higher bidder, and then Exxon declined to fill its obligations." Upon a review of the record we cannot discern even a colorable contract clause. If there were such, General Chemicals, Inc.'s treatment of it in this appeal would probably constitute a waiver.

■ There may be some dispute as to the exact reasons Exxon chose to sell to Bamberger Compounds rather than the appellant—perhaps Exxon employees were anxious about the plaintiff's ability to move the scrap quickly; perhaps they simply disliked the owner of General Chemicals—but skilled counsel have failed to come up with *any* theory, reasonable or otherwise, that could support the conclusion that there was a conspiracy among the defendants. In view of the plaintiff's confessed inability to construct a conspiratorial explanation of Exxon's conduct, and in the absence of any reason to believe Exxon would have benefited by entering into a conspiracy with Bamberger Compounds,[4] the case was properly terminated without a trial. This simple litigation, in which the plaintiff extensively examined the defendants and their records, is one that even the dissenting justices in *Cities Service* would find an appropriate subject for summary disposition.

More difficulty is encountered in dealing with the Robinson-Patman Act dispute because the district court never mentioned the Act and discussed the disparate prices only briefly. Nonetheless the judge felt he was disposing of the whole case, and the parties have treated his judgment as doing just that.

As mentioned earlier, Exxon sold scrap to each buyer at the price bid by that buyer, so there was no uniform price. While the amended complaint is not a model of clarity, in the briefs in support thereof as well as in the appellate briefs and the oral argument of this appeal, General Chemicals Inc., only quarrels with Exxon's preferential treatment of Bamberger Compounds.

■ The Robinson-Patman Act makes it unlawful for any person engaged in commerce, in the course of such commerce . . . to discriminate in price between different purchasers of commodities . .

where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States . . . .

15 U.S.C.A. § 13(a). Thus, in order to prevail General Chemicals, Inc., had to prove that the scrap Exxon sold to Bamberger Compounds was "for use, consumption, or resale within the United States". Since Bamberger Compounds exported everything it bought from Exxon, its conduct fell within the territorial exception of Robinson-Patman. Hence, summary judgment was proper. *See generally, Baysoy v. Jessop Steel Co.*, 90 F.Supp. 303, 305 (W.D.Pa. 1950); F. Rowe, *Price Discrimination Under the Robinson-Patman Act* § 4.10 (1962).

According to the invoices, all the Bamberger Compounds scrap was shipped abroad immediately. This was repeatedly confirmed by Claude Bamberger during his deposition.[5] The plaintiff admits as much but argues that domestic resale prices were higher than those in Hong Kong, and therefore "[g]iven the nature of the chemical commodities trading business where a trader buys where he can and sells where he can, [Bamberger's] testimony pales somewhat." This is not evidence for a jury. General Chemicals, Inc., was allowed unrestricted discovery, and took advantage of the opportunity, yet it was unable to demonstrate that Bamberger Compounds resold any of the scrap in this country. Bamberger Compounds had no shipping facilities of its own, and it is extremely unlikely that it would have repatriated any scrap, given the relative importance of transportation costs in resale prices.

The judgment of the district court is AFFIRMED.

---

4. The plaintiff submitted the affidavit of an Exxon employee to the effect that he knew that another Exxon employee had received a case of liquor from Bamberger Compounds. Although such business practices may not be condoned this evidence, without more, is not enough to justify the inference of an anti-competitive conspiracy.

5. Some scrap purchasers use scrap themselves in compounding plastics. Bamberger Compounds did no manufacturing, but only traded scrap.